ELLIS, Judge.
Plaintiff, individually and on behalf of his minor son, filed this suit in which he is seeking to recover expenses and damages allegedly suffered by his son as a result of having been struck and injured while riding his bicycle across North Forty-fifth street in the City of Baton Rouge by a truck belonging to the defendant and driven at the time by the latter’s employee, Nolan Chaix, at about 5:00 p. m. on May 29, 1956.[1]
The lower court rendered judgment in favor of the plaintiff, individually, in the sum of $146.50, plus legal interest thereon from the date of judicial demand until paid, and further judgment in favor of the plaintiff on behalf of his minor son for the sum of $3,000, plus legal interest thereon from date of judicial demand until paid, and for all costs of suit.
From this judgment the defendant has appealed.
The accident in question occurred on North Forty-fifth Street which is an asphalt street, 23 feet in width and runs north and south and intersects Winborn street, which is 22 feet in width and runs east and west. West of the intersection of the two streets and south of Winborn Street is an eleven foot shoulder which adjoins the concrete, and south of this shoulder is a four foot concrete sidewalk which ends thirteen feet from the west parallel line running north and south of North Forty-fifth street where its intersects Winborn street. At the end of the sidewalk is a three to four inch drop down to the dirt. Approximately three feet south of an extension of the south parallel line of this sidewalk and a distance four feet six inches east of the end of the sidewalk is a utility pole, and a short distance south and in a diagonal southeast *705 direction from this pole is a fireplug which is seven feet from the west parallel boundary line of North Forty-fifth street. Also playing an important part in the facts in this case is a path shown on a map introduced herein which runs from the sidewalk mentioned diagonally in a southeast direction and which leaves the sidewalk at a point approximately twenty-three feet west of its eastern end. This path ends at a point where it connects with a concrete parking space used in connection with a doctor’s office building. This concrete parking space joins the western parallel north and south boundary line of North Forty-fifth Street. Following the diagonally running path just described from its beginning and thence across the concrete parking space to the west boundary line of the asphalt portion of North Forty-fifth street is a distance of 36 feet. It is also shown that on the eastern side of North Forty-fifth Street and the southern side of Winborn Street at their intersection for a distance to the south past the established point of the accident, which is shown to be 15 or 16 feet south of the-intersection of North Forty-fifth and Winborn Avenue, there is shell and gravel for a distance of approximately three feet out into North Forty-fifth Street along its eastern boundary and extending on up into Winborn Street. This shell and gravel got into the street from a parking lot south of Winborn Street and east of North Forty-fifth street which is used in connection with a commercial establishment.
At about 4:45 p. m. on the day of the accident the defendant’s truck, driven by its employee, came down Winborn street traveling west, and when it got to North Forty-fifth Street he turned to his left or to the south on his way to the defendant’s place of business three blocks to the south, and when he had gotten into North Forty-fifth Street twenty-six feet south of the south parallel line of Winborn Street, which would also be fifteen feet south of the north parallel line of the concrete sidewalk which has been described as ending thirteen feet to the west of the east side of North Forty-fifth street, the front end of the truck struck plaintiff’s son who was attempting to cross North Forty-fifth Street from west to east.
It is the plaintiff’s contention that his minor son had been sent by his mother, along with his older brother, Richard, on an errand to purchase something at a store located to the west of North Forty-fifth Street, and the two brothers had been joined by a friend Mike Causey, and all three boys had ridden their bicycles to the store and were returning to the plaintiff’s home at the time of the accident. The home of the plaintiff was located one block east of North Forty-fifth Street and two blocks south of Winborn Street on Addison Street. Therefore, plaintiff’s sons and their friend could have returned to plaintiff’s home by proceeding along the sidewalk heretofore described to the west of North Forty-fifth Street and crossed the latter street to the east side and continued on the sidewalk along the south of Win-born Street one block to turn south and have gone two and a half blocks, or the boys could have come down the sidewalk to its end and then the thirteen feet to North Forty-fifth street and then turned to the south and gone down North Forty-fifth Street two blocks and then over to Addison Street and thence home. The third alternative or route that could have been traveled by these boys was to come along the sidewalk on the south of Win-born Street until they got to the path which intersected the sidewalk at a point 23 feet from its end and followed this path which ran in a diagonally southeast direction until it joined the concrete parking space heretofore described and thence across this parking space and either south on North Forty-fifth or across North Forty-fifth Street to its eastern side and thence either back north to Winborn Street and home or, more likely, turn south on the east side of North Forty-fifth street for two blocks and across to Addison Street and then one-half block to their home. These routes *706 are mentioned as it is the plaintiff’s contention that his minor son in company with his older brother and friend, came down the sidewalk to the south of Winborn Street to its end and then out into North Forty-fifth Street with the intention of crossing to the east side thereof and thence continuing along the sidewalk south of Winborn Street to Addison Street and then south to their home, whereas, it was the defendant’s contention that the boys came to this sidewalk which it is definitely shown was used by bicycle riders and particularly the children in the neighborhood and those which attended a school to the east of North Forty-fifth Street and south of Winborn, and at this point the young son of plaintiff, who was in the lead, turned along this path and that there were at the time six cars, or approximately that many, parked on the concrete parking space and that he proceeded from this concrete parking space directly into the path of the defendant’s truck. The plaintiff also contends that the point of the accident was eight feet from the east parallel line of North Forty-fifth Street and thirteen feet from the West parallel line of North Forty-fifth Street, whereas the defendant contends that the point of the accident was slightly to the left of the front center of the truck and that the latter was exactly in the middle of the street. In other words, the defendant contends that its truck had turned from Winborn Street into North Forty-fifth Street and was exactly in the middle of the street, half of the truck being in the east or north bound lane of travel and the other half in the west or south bound lane of travel on North Forty-fifth Street.
The plaintiff further contended that the failure of the driver of defendant’s truck to turn from Winborn Street to his left into North Forty-fifth street as legally directed under the provisions of LSA-R.S. 32:235, which provides that:
“Except as otherwise provided in this Section, the driver of a vehicle intending to turn to the ■ * * * left shall approach such intersection in the lane for traffic to the right of and nearest the center line of the highway and in turning shall pass beyond the center of the intersection, passing as closely as practicable to the right thereof before turning to the left,”
constituted negligence on the part of the driver of defendant’s truck which was the proximate cause of the accident and injury to plaintiff’s minor son.
This case was tried in the lower court on the 3rd and 7th of May, 1957 and with written reasons, decided in favor of the plaintiff on the 30th day of July, 1957, and the testimony heard on the trial was not filed until November 13, 1957, therefore, the lower court in deciding the case did not have the benefit of the actual testimony given on the trial. The lower court in its written reasons stated that he believed the minor son of plaintiff had ridden his bicycle down the regular sidewalk with the intention of crossing North Forty-fifth street and continuing down the south side of Winborn Street to Addison Street and then on to his home, however, when he got to North Forty-fifth Street his failure to see defendant’s truck turning into North Forty-fifth Street constituted contributory negligence on the part of the minor son of plaintiff. However, the lower court specifically stated that the fact that the minor was crossing North Forty-fifth when hit at a point 12 or 15 feet south of the sidewalk crossing, played no part in the court’s determination that the boy was guilty of contributory negligence, “because the evidence showed that he started across the street at the sidewalk Hire and why he made the slight turn toward the southwest or to his right no one knows, but it is my belief he was trying to get around the truck.”
The Lower Court also found the driver of defendant’s truck to have been guilty of negligence when he violated the rules of the road in making his left turn from Winborn Street and particularly violated *707 that part of LSA-R.S. 32:235, supra, with regard to a motorist turning to his left at an intersection, and further held that the driver of the defendant’s truck under the facts had the last clear chance to avoid the accident, and hence judgment was rendered in favor of the plaintiff.
It is first necessary for this Court to decide whether plaintiff’s minor son rode his bicycle along the regular sidewalk on the south side of Winborn Street and thence into North Forty-fifth Street and then turned south a distance of approximately fifteen feet and thence east a distance of approximately 13 feet to the point of the accident, or whether he rode his bicycle along the bicycle path which began 23 feet from the end of the regular sidewalk and led in a diagonal or southeast direction to the concrete parking space, and then rode across this concrete parking space into North Forty-fifth Street and straight east approximately 13 feet to the point of the accident. It is evident that the lower court was, and this court is now, handicapped in its consideration of this question by the unexplained failure of the plaintiff’s son, who was more than eight years of age at the time of the trial, and who was present during the trial, to testify, as well as the unexplained failure of the plaintiff producing as a witness Mike Causey, the friend of the two McCandless boys, who was riding his bicycle along with them and presumably was present and witnessed the accident. The trial court commented upon the failure of the plaintiff’s injured son being present as a witness as follows:
“The injured boy in this case was not presented as a witness. The decision not to allow him to be called as a witness must have been that of the plaintiff and his attorney. They could have called him. All the evidence on the subject indicates that this boy is of average intelligence and mentality for a boy of his age. Therefore, there is no way to escape the application of the rule that the failure to call an available witness gives rise to a presumption that his testimony would not be favorable to the plaintiff.”
The same thing is applicable as to Mike Causey. We have only the testimony of Richard McCandless, Jr. as an eye witness on behalf of the plaintiff. He testified that he, Mike Causey and his younger brother, the injured boy, had been to the dime store on Winborn Street, and were returning to his home on their bicycles along the sidewalk on Winborn Street and that he was riding “pretty close” behind his younger brother as they approached the corner of North Forty-fifth and Win-born Street and that his brother stopped at the corner and started across the street and he saw him get hit by the truck. He did not see the truck driver stop the truck “right at Bobby”, nor did he see the truck driver pick his young brother up and put him on the side of the road. He further stated that they intended to continue down on the east side of Winborn Street after crossing North Forty-fifth street and he readily admitted that he did not see the defendant’s truck “until it hit Bobby.” He further testified that there was “a pretty good bit of traffic” traveling in both directions on Winborn Street about the time of the accident, which is in conflict with other positive testimony on this part. Another evident error in his testimony is that when he and Bobby, his younger brother who was injured in the accident, left home to go to the store around five o’clock, that his mother was at home. His mother testified that she left home at four o’clock to go to work “at Jack’s Cookie Company, which I go to work at four o’clock in the afternoon.” On cross examination, Richard Jr. testified that when they were returning from the store Bobby, his brother was riding in front, he was in the middle, and his friend Mike Causey was behind him, and that when they reached North Forty-fifth street he did not see any traffic going one way or the other on this street. He was then asked the following questions :
*708 “Q. The only thing to obstruct your view was a telephone pole on that corner, as I understand it, is that right? A. Well, I saw it all.
“Q. You saw what, all what? A. I seen Bobby whenever he was hit.
“Q. But did you see the telephone company truck before Bobby was hit? A. No, sir.
“Q. Now, what was in your way to keep you from seeing the telephone company truck before Bobby was hit?
A. Maybe a car, but I didn’t see the truck, no.”
This witness stated that after his brother was struck by the defendant’s truck that he rode on across North Forty-fifth Street and went in front of the truck and when asked if he had to turn south on Forty-fifth Street to get in front of the truck answered :
“A. A little bit, yes.”
From reading this witness’s testimony, it is so brief and vague that it is almost as if he was not there.
On the other hand we have the testimony of the driver of the defendant’s truck that he was traveling west on Winborn Street preparatory to reporting at the end of his day’s work at the office of his employer which was located three blocks south of Winborn Street on North Forty-fifth street, and that when he got to North Forty-fifth Street there was no traffic approaching on Winborn nor on North Forty-fifth Street and he turned south and he first saw plaintiff’s minor son when he rode his bicycle from the west side of North Forty-fifth street directly in front of his truck. He stated that he did not see the boy until he was practically in front of his truck, but that he came from his right side. At one point in his testimony he answered :
“They asked me the way I was coming from and I told them I — and I made my turn and this child appeared from the side of the road from behind these cars, on the side of these cars. I can’t say he came from behind the cars, but there was cars parked on the side of the road there, on that concrete apron.”
On cross examination he was asked:
“Q. Now, your testimony is to the effect that the child came from between or behind the cars?
“A. I don’t know — he came from the direction where those cars were parked. I don’t know if he came between or behind them, I don’t know. Like I say I didn’t see the child until he was in front of that truck.”
He further testified that he did not think the boy used the sidewalk when he came into North Forty-fifth street. The testimony shows that the cars to which the driver of defendant’s truck was referring were parked on the concrete parking apron adjacent to the doctor’s office and the so-called bicycle path led directly on to the northern portion of this concrete parking apron. The driver of defendant’s truck further testified that when he turned into North Forty-fifth Street he reduced his speed to eight or ten miles per hour and that as soon as he saw the little boy in front of his truck on his bicycle he applied his brakes and the evidence establishes that all four wheels left three feet of skid marks on the asphalt street. The presence of the skid marks is questioned because of the fact that photographs which were taken the following morning and introduced in evidence do not reveal these marks. These skid marks are established by the testimony of Officer Thomas who investigated the accident when he testified as follows:
“From the evidence that I could see at the scene the truck cut the corner short there. North Forty-fifth Street widens out quite a bit right at the intersection with Winborn. It is quite a bit wider than the twenty-one feet where the p. o. c. occurred and from the three feet of skid marks left by the truck and his position it indicated that he had cut the corner short when he made his left hand turn off of Winborn.” (Emphasis added.)
*709 This officer was present at the scene within a very short period of time after the accident happened.
Also the driver of the truck was questioned and answered as follows:
“Q. Mr. Chaiz, after you saw this child did you make any effort to swerve your truck to keep from hitting him?
“A. There was no chance. He just came out in front of me. I was lucky to get my brakes on to keep from hitting him.”
Again he testified:
“Q. Alright, now, these skid marks that you have mentioned, did you point them out to Mr. Carruth? A. That evening I did.
“Q. The evening of the accident? A. Of the accident, yes, sir.
“Q. You showed Mr. Carruth the skid marks that afternoon? A. Yes, sir.
“Q. Were they measured then? A. They were.
“Q. Were they measured again the next morning?. A. The next morning?
“Q. Are you positive that you placed the truck on the same skid marks? A. Yes, I am.”
Mr. Carruth, who was the supervisor of installation for the defendant company was immediately notified of the accident by the driver of the truck and immediately went to the scene and investigated the accident and made measurements of “where the truck had stopped,” and he also testified as follows:
“Q. Were there any skid marks in evidence ?
“A. Yes, sir, there were skid marks on all four wheels of the truck very plain and approximately three feet long.”
“There is no testimony, not one scintilla, by or on behalf of the plaintiff - or the defendant that refutes the existence of the skid marks made by..the defendant’s truck three feet or approximately that length.”
The truck came to a stop and the driver testified that the bumper of his truck was against the left leg of the boy who was standing still astraddle of the small girl’s bicycle which he was riding at the time of the accident and that as he got out of the truck the boy fell, with the bicycle still between his legs, to the south. That when he got around to the front of the truck he pulled the boy from the bicycle, which at the time was also lying on the asphalt street. This testimony is unrefuted in the record, and the only ones who could have given additional testimony on this point would have been the injured boy and his friend Mike Causey, neither of whom were placed on the stand by the plaintiff.
The estimate of the speed of the truck made by its driver is strongly supported by both the Lawyers’ Motor Vehicle Speed Chart and the Cyclopedia of Automobile Law and Practice by Blashfield, Vol. 9, see Sec. 6237, page 413. Under the former we find that by using the distance which defendant’s truck travelled in this car after the brakes were applied and which has been definitely established at three feet that the speed of the truck would have been approximately five miles per hour and would have required a total braking distance of ten and seven-tenths feet, and the truck would have been covering seven and three-tenths feet per second. If we use Blash-field’s speed chart, supra, we find that the speed of defendant’s truck was less than ten miles per hour for under this chart a motor vehicle ordinarily stops within four and five-tenths feet of the time its brakes are applied provided the brakes are in excellent condition. We realize as has often .been stated that charts of stopping distances furnish only useful standards for comparison, and the special circumstances or facts of each case must also be considered. How *710 ever, it has been shown that the brakes on this truck were in excellent condition and that it was a dry clear day, which closely fulfills the requirements necessary for any degree of accuracy in the estimations furnished by the two speed charts. Therefore, as the point of the accident was approximately fifteen feet from the regular sidewalk along Winborn Street from which plaintiff contends his son entered North Forty-fifth Street, then according to the two charts, at the time the driver testifies he first saw the boy riding in front of his truck on the bicycle from the east side, the truck was ten and seven-tenths feet to approximately twelve feet from the point of collision. This would place the front of the truck at the time the driver saw the boy at approximately a foot past the south line of the sidewalk, and under these facts if Richard McCandless was riding behind his brother, it would have been practically impossible and at least most improbable that he would not have seen this truck before it collided with his brother’s bicycle. It must be remembered that he testified that he never saw the truck but he saw the accident, that is, when the truck struck his brother, and after that he rode out into North Forty-fifth Street on his bicycle and proceeded around in front of the truck and of course in order to do this it was necessary that he turn and ride fifteen feet south on North Forty-fifth Street. It is practically impossible under the testimony, if we are to accept plaintiff’s contention that his son rode off of the regular sidewalk into North Forty-fifth Street and turned south and then east so as to place his bicycle in an east-west direction in front of the truck, for this court to even guess how plaintiff’s son could travel from the sidewalk and down Forty-fifth Street and to the point of the accident. It is particularly baffling when we consider that Richard, Jr. testified they intended to go directly across North Forty-fifth Street and proceed on down Winborn Street. If he proceeded into North Forty-fifth Street just ahead of the truck and saw the truck and for that reason turned south then all he had to do was to continue south or veer back to the west edge of North Forty-fifth Street. One of the officers was of the opinion that plaintiff’s young son came off of the sidewalk into North Forty-fifth Street and traveled south diagonally to the point of accident, however, this theory would not fit the physical facts that his bicycle was lying east and west and if it had been traveling diagonally when it was struck it is not likely that it would have been in the position which the only eye witness, the truck driver, testified that it was at the moment he stopped his truck. There is another fact which casts serious doubt upon plaintiff’s theory, and that is the testimony of Mrs. Pierce who was down in front of her home on North Forty-fifth Street and saw the defendant’s truck as it was turning from Win-born Street into North Forty-fifth Street and at no time did she see plaintiff’s son riding south in front of the truck or riding anywhere on North Forty-fifth Street. She did not see the boy when he was struck but almost instantly afterward. The burden was upon the plaintiff to present evidence to support his contention, and it falls far short of convincing us that plaintiff’s son came off of this sidewalk into North Forty-fifth Street. Perhaps had plaintiff seen fit to place this boy and his friend on the stand, much that is now in doubt would have been cleared by their testimony.
On the other hand, the testimony and contention of the driver of defendant’s truck that this boy came from the west around the concrete parking space directly in front of his truck supports the belief that these boys used the “bicycle path” rather than the regular sidewalk and explains why the driver of the truck did not see these three young boys riding their bicycles along the sidewalk on the south side of Winborn near its intersection with North Forty-fifth Street, and also explains the failure of Richard McCandless, Jr. to see the truck until the moment of the collision, and also explains why Mrs. Pierce when she saw the truck turning into North Forty-fifth Street did not see plaintiff’s son *711 on his bicycle near the intersection or riding south on North Forty-fifth Street just before the actual collision.
It is definitely established that the point of the collision or accident occurred in the north bound or east lane of traffic. There is much argument as to whether the point of the accident was eight feet from the east line of North Forty-fifth Street or nearer the center of the street. The driver of defendant’s truck testified that the boy was struck by the left front portion of his bumper and the truck at the time is shown to have been in the center of the road. Thus the left half of the truck was in its wrong lane of travel to the east of the center line in the street and therefore considering the position of the truck and the testimony with regard to the point of the accident, it is clear that the boy was struck to the left of the center line and had proceeded more than half way across North Forty-fifth Street. The contention of the plaintiff and the testimony of the witnesses testifying in his behalf and particular the officers to the effect that the accident or the point of accident occurred eight feet from the east line of North Forty-fifth Street and thirteen feet from the west line of North Forty-fifth street based upon a width of twenty-one feet for the asphalt portion of the street. Actual measurement revealed that this truck was twenty-three feet, however, the difference in the testimony can be reconciled because of the presence of shell and gravel covering two or three feet of North Forty-fifth Street from its intersection on the east side down past the point of the accident. We therefore believe that had the officers taken into consideration the width of twenty-three feet that they would have placed the point of collision at ten feet from the east line of North Forty-fifth Street, for there was nothing on the west half or other portion of the street to the point of accident which would have interfered with a correct measurement of the distance, and using thirteen feet as the correct base and twenty-three feet as the correct width would place the point of accident at ten feet from the east line and thirteen feet from the west line of North Forty-fifth Street. Therefore the contact between the truck and the left leg of the boy was made approximately one and one-half feet beyond the center line of North Forty-fifth Street or in the north bound, or east lane of traffic, which, considered in its most unfavorable light to the plaintiff, would have left a very small portion of the rear of the bicycle, possibly slightly more than a foot, to the west of the center line of North Forty-fifth street, which would not have interfered with the safe passage of the defendant’s truck to the rear of the bicycle had it been in its proper south bound lane of traffic on North Forty-fifth Street, rather than in the center of the road,There would have been no accident as each lane of travel is eleven feet and six inches on North Forty-fifth Street, and defendant’s truck was six feet three inches wide. We therefore agree with our brother below when he stated that it was his opinion “from the evidence on the location of the truck at the time of the collision that defendant’s driver violated the rules of the road in making his left turn from Winborn and particularly he violated that part of LRS 32:255 which required that the driver of a vehicle ‘ * * * when intending to turn to the left shall approach such intersection in the lane of traffic to the right of and nearest the center line of the highway and in turning shall pass beyond the center of the intersection, passing as closely as practicable to the right thereof before turning to the left.’ ” Had defendant’s driver done what he was supposed to do under the law the accident would not have occurred and therefore any contributory negligence on the part of the boy and holding that the driver of the defendant’s truck did not have the last clear chance would not relieve the defendant of liability, for the proximate cause of this accident was the negligence of the driver of defendant’s truck to make his left turn from Winborn into Forty-fifth Street in accordance with the law. Had he done so he would have been on his own proper side of the street and regardless of *712 whether the boy darted out in front of him he would have passed in front of the truck before it could strike him. In addition, had the truck made the proper turn by traveling the added distance necessary to do so, there can be little doubt but that this boy would have been safely across the west, or south bound, lane of traffic.
There remains to be decided the quantum. There is no testimony that this boy was struck a hard blow as there were no marks or damage to his left side or left leg which was in contact with the bumper of defendant’s truck and on which side he was struck. Neither is there any testimony that he was knocked any distance and the only testimony which is unrefuted, as previously stated, is by the driver of the truck that as his truck came to a stop with the bumper resting against the left leg of the boy, and he and the bicycle fell south, and this also accounts for the fact that the only injuries suffered were to the right side of the boy’s body. The first person to arrive at the scene was an unidentified man whose name was unknown and who presumably called the boy’s mother at her place of employment, as she testified that she was called by an unidentified man and notified of the accident. Mrs. Pierce and Mr. Pierce arrived at the scene after the boy had separated from the bicycle or we might say removed from the fallen bicycle. Mrs. Pierce testified that the bicycle was approximately three feet in front of the truck and the boy further to the south. There is testimony that it would cost $21 to repair the bicycle, which would indicate that it had been struck with more force than the testimony of the driver of the truck would lead one to believe. The testimony with regard to the repair of the bicycle must be considered in the light of the fact that this was his sister’s bicycle which had no cross bar from the seat to the handle bars, and there is no testimony how old it was, nor what condition it was in, that is, if the estimated repairs were all the result of the accident, or a portion or all of them existed prior to the accident. The burden was upon the plaintiff in this case. The fact that there was no injury to the left side and particularly the left leg of the boy is most persuasive, that he was not struck with much force, and that the injuries which he received resulted when he fell while still standing astraddle of the bicycle and struck with his right side against the asphalt.
Dr. Holden on the date of the accident was taking accident calls at the Baton Rouge General Hospital and was called to see Bobby McCandless and when he came to the accident room he was told that the boy had been struck by a Southern Bell Telephone truck and knocked off of the bicycle. This doctor testified:
“ * * * When I first saw the child he appeared a little dazed and somewhat confused. He may have just been nervous being in a hospital. Then upon examination and after I got to talking to him for a little while he seemed to feel a little better and was alert. Actually on examination he was alert and answered questions very coherently.
“Q. Were there any injuries to the lad, doctor? A. Yes, sir, on examination there were some several contusions and abrasions on the right side of the head around the forehead and then around the area of-the ear, right above the right ear.
* * * * * *
“Q. Were there any foreign bodies embedded in the scalp? A. No, sir, the injuries were mainly limited to abrasions or brush burns and contusions which showed bruise marks around the forehead and beneath the hair, around the hair line and right above the right ear.
“Q. Were there any other parts of his body affected, Doctor? A. Yes, sir, he had similar abrasions and contusions around the right elbow and the right lower extremities, in fact, both lower extremities around the knees.
*713 These were mostly in the area of the elbow and the forearm on the right and also the right leg and around the knee.”
Dr. Holden also diagnosed the head injury as a cerebral concussion because the boy complained of a slight headache, although he told the doctor that he was not knocked unconscious, but he was dazed or felt dizzy, and it was on this basis that the doctor made a tentative diagnosis which he later substantiated by observation, “of cerebral concussion plus multiple contusions and abrasions.” The boy was hospitalized over night which the doctor explained was a common practice if there were any head injuries and that thereafter he saw him on four or five occasions and the boy had similar complaints and that was the reason that he continued to see him over the stated period of time, as he continued to complain of a slight headache plus a little weakness and some dizzy spells. Dr. Holden saw the boy on visits to his office on the 30th of May, June 4, June 8, June 12, June 20, and for a last check up on January 29, 1957. This doctor had rendered a report and in it he said that the patient was discharged on June 20, 1956 with no complication having developed and physical examination upon discharge including neurological examination, which was within normal limits.
Dr. Charles McVea of Baton Rouge, Louisiana examined Bobby McCandless on the 29th of April, 1957 and at the time the boy was not complaining of anything in particular, however, the mother told him that she thought the boy was considerably more nervous than he had been before the accident, had stomach ache frequently, which he did not have prior to the time of the accident. Dr. McVea found nothing significant as regards to injuries or disturbances of the head, neck, chest, upper extremities or trauma, and found no bruises or brush burns at that time or no scars as a result of his injuries. The X-ray examination of the skull taken on May 29, 1956 showed no injuries and it was Dr. McVea’s impression that this boy had probably suffered the contusions and brush burns which he and his mother described, but at the time that he saw him he thought the child was in good condition and had no abnormalities which he could relate to the accident, and he did not feel at the time of the examination that the boy was particularly nervous, as he responded satisfactorily to-questions and he thought he was essentially a normal child,
From the evidence this boy’s injuries were superficial and of a minor nature, accompanied with very little suffering, and we believe that the award is excessive as compared to those found in recent cases, with similar injuries. The judgment in this respect will therefore be reduced to the sum of $1,500 and as amended it is hereby affirmed.

. The minor at the time of the accident was 7 years, 2 months and 8 days of age.