193 So.2d 873 (1967)
Rene J. GUIDRY, as Administrator for the Estates of his Minor Children, Plaintiff and Appellee,
v.
GRAIN DEALERS MUTUAL INSURANCE COMPANY et al., Defendant and Appellant.
No. 1894.
Court of Appeal of Louisiana, Third Circuit.
January 11, 1967.
Rehearing Denied February 1, 1967.
*875 Cavanaugh, Brame, Holt & Woodley, by Frank M. Brame, Lake Charles, for defendant-appellant.
Jones, Kimball, Harper, Tete & Wetherill, by James C. Hanchey, Lake Charles, for defendant-third-party plaintiff-appellee.
Henry L. Yelverton, Lake Charles, for plaintiff-appellee.
Before FRUGÉ, SAVOY and CULPEPPER, JJ.
CULPEPPER, Judge.
Rene J. Guidry, individually and as administrator of the estates of his four minor children, seeks damages for personal injuries to said children resulting from an automobile accident. The children were passengers in an automobile being driven by their mother, Mrs. Lorraine Guidry. The defendants are: (1) Grain Dealers Mutual Insurance Company, liability insurer of the Guidry vehicle; (2) Ronald Savoie, driver of the other vehicle; and (3) Hartford Accident & Indemnity Company, Savoie's liability insurer. The district judge held the accident was caused solely by the negligence of Mrs. Guidry, and hence granted judgment against her insurer. Savoie was held free of fault and the action as to him and his insurer was dismissed. Mrs. Guidry's insurer, Grain Dealers Mutual Insurance Company, appealed.
On appeal, Grain Dealers admits that its insured, Mrs. Guidry, was negligent. It contends that Ronald Savoie was also negligent in (1) traveling at a speed in excess of the 25 MPH legal limit and (2) failing to see the Guidry automobile violate a "Yield" sign in time to avoid the collision.
The collision occurred at the intersection of Marauder Street, which runs north and south, and Mustang Street, which runs east and west, in a residential area of the city of Sulphur, Louisiana. Both streets are of asphalt construction and contain the usual two traffic lanes. Marauder Street enjoys the right of way over Mustang Street, there being a "Yield" sign located on the northeast corner of the intersection.
Mrs. Guidry testified that at about 4:50 p. m. on October 9, 1964 she was traveling west on Mustang Street at a speed of 15 to 20 MPH; on approaching Marauder Street she "slowed down to almost a stop. I didn't stop, and I looked both sides and didn't see anything coming, so I entered the intersection."; when she was about half-way across the intersection her little girl said "there's a car"; and then the front of the Savoie vehicle, which was traveling north on Marauder Street, struck the left rear door and fender of the Guidry automobile.
Ronald Savoie testified that he was proceeding in a northerly direction on Marauder Street at a speed of about 25 MPH; he first saw the Guidry vehicle when he was 55 or 60 feet from the intersection at which time Mrs. Guidry was already "proceeding into the intersection"; he immediately applied his brakes but was unable to avoid the collision.
The record supports the trial judge's finding that the Savoie vehicle left 33 feet of skidmarks to the point of impact, which was approximately in the center of the intersection, and 8 feet of skidmarks in a northwesterly direction beyond the point of impact.
The defendant appellant argues that the length of these skidmarks proves Savoie was exceeding the speed limit of 25 MPH. Counsel for the appellant attaches to his brief a copy of the stopping distance chart found in Blashfield, Cyclopedia of Automobile Law and Practice, Vol. 9C, Sec. 6237 which chart shows that at 30 MPH the actual stopping distance, not including reaction time, for a car with brakes in excellent condition, is 40 feet. Appellant contends that the total of 41 feet of skidmarks left by Savoie, plus the slowing effect of the collision, shows that Savoie was exceeding 30 MPH.
*876 In answer to this argument, Savoie's insurer contends that the stopping distance chart referred to in defendant appellant's brief should not be considered by the court because it was not introduced in evidence. Defendant cites Gaines v. Standard Accident Insurance Company, 32 So.2d 633 (La. App., 1st Cir. 1947) in which the court said:
"We approve and adopt that opinion in full except the part about the tables prepared by insurance companies to show the distance required to bring vehicles to a stop under certain speeds and under particular circumstances.
"We do not think these tables should have been considered by the District Judge without having been offered in evidence with proof of their accuracy.
"(6, 7) In deciding a case a Court should not consider a scientific or technical work, treatise or table which has not been admitted in evidence in the case. Such a work, treatise or table should not be admitted in evidence without proof of its accuracy. An instance of the use by the Courts of such a table which had been offered in evidence with proof of its accuracy is found in Hafner Mfg. Co. v. Lieber Lumber & Shingle Co., 127 La. 348, 358, 53 So. 646."
Defendant makes a strong argument that the above quoted rule should be followed because an increasing number of these charts are being published and they vary to a significant extent. Furthermore, they are based on many different variable factors. He has attached to his brief copies of several charts to show these variations. For instance, the one found in 14 Tulane Law Review 503 shows that at 30 MPH the net braking distance varies from 35.3 feet under excellent, to 50 feet under average, to 150 feet under poor conditions. There are several charts found in American Jurisprudence 2d Desk Book; the one on page 453, shows that at 30 MPH the braking distance with "good brakes" is 48 feet; the chart at page 454 shows that stopping distances vary considerably according to the condition of the brakes and gripping efficiency of the pavement and of the tires, the braking distance of "good brakes on good pavement" at 30 MPH being given at 46 feet; the chart found at page 456 shows that the size, weight and the type of the vehicle varies the stopping distance considerably.
A discussion of the applicable law should start with the general rule that scientific or learned treatises, books, charts, formulas, etc. are not admissible as independent evidence of the opinions expressed therein. They are objectionable as hearsay, being extrajudicial and unsworn statements by persons not available in court for cross-examination. Wigmore on Evidence, 3rd Ed., Vol. VI, Sec. 1690; 32 C.J.S. Verbo Evidence § 718, p. 1023, 20 Am.Jur. 2d 812, Verbo Evidence, Sec. 964. Several exceptions to this rule have been established by jurisprudence in various jurisdictions, as for instance mortality tables, annuity tables, tide tables and almanacs, on the basis that they are recognized authorities of mathematical calculations or deal with exact sciences. 32 C.J.S. Verbo Evidence, §§ 719-726, pp. 1023-1031. However, in only a few cases have charts showing the stopping distances of automobiles been held admissible as independent evidence. Blashfield, Cyclopedia of Automobile Law and Practice, Vol. 9C, 1964 P.P., Sec. 6237.
One of these cases is Bergeron v. Hetherwick, 140 So.2d 440 (La.App. 1st Cir. 1962). We cannot agree with the Bergeron case. Its effect is to except these charts from the general rule that scientific treatises are not admissible as independent evidence. We think these charts are not so uniform, so well recognized or so scientifically precise that they should be excepted from the general rule.
However, there are many Louisiana cases in which the courts have cited and used these charts for broad general comparisons of speeds and stopping distances, *877 even though the charts were not in evidence. See Blashfield, Cyclopedia of Automobile Law and Practice, Vol. 9C, 410-416, Sec. 6237, and 1964 P.P. 90-91, Sec. 6237. This practice is so well established we hesitate to express a contrary view. However, we think that where such charts have not been properly admitted in evidence, with proof that they are reasonably accurate and relevant to the facts of the particular case, they should be used by the court with great caution; i. e., they should be used only for broad general comparisons and not for precise calculations to determine speed or stopping distances.
This is essentially the holding in most of the above cited cases. For instance, in McCandless v. Southern Bell Telephone and Tel. Co., 101 So.2d 704 at 709 (La.App. 1st Cir. 1958) the court said:
"We realize as has often been stated that charts of stopping distances furnish only useful standards for comparison, and the special circumstances or facts of each case must also be considered."
In Randall v. Baton Rouge Bus Company, 114 So.2d 98 at 112-113 (La.App., 1st Cir. 1959) it is stated:
"While we recognize that stopping distances charts are based upon assumptions as to stopping surfaces, braking efficiences, and reaction times which are to some extent variable, we think that the testimony in this case indicating a normal hard-topped stopping surface (see testimony of police officer and plaintiff's expert; testimony of defendant's expert that at times different than the time of the accident there was gravel on stopping surface, is not sufficient to out-weigh same) and at least average braking efficiency on the part of the bus, together with the testimony of the experts indicating what the `Driver's Guide' stopping distance table could with some degree of reliability be applied to the present instance, justifies our use of same for purposes of determining the approximate location of the bus at the time the danger was reasonably perceived and whether, at that time, the bus could have been stopped if proceeding at 30 mph."
Applying these views to the present case, we cannot use the Blashfield chart to make the precise calculations necessary to support defendant appellant's position. Skidmarks of 41 feet, even considering the decelerating effect of the collision, are not so greatly in excess of the stopping distances given in the charts for 30 MPH that a speed of over 30 MPH is apparent.
Defendant appellant's next contention is that Savoie was negligent in failing to see the Guidry automobile until "one half of it was in the intersection." At the outset, we note there is a question of fact as to Savoie's testimony in this regard. He first testified that when he initially saw the Guidry car it was "proceeding into the intersection". At another point he said that when he first saw the Guidry car "it was just nosing into the intersection." Later, under cross-examination, his testimony could possibly be construed to mean that when he first saw the Guidry vehicle it was already across the center of the intersection. This latter construction is very unlikely if we consider that Savoie was 55 or 60 feet away from the intersection when he first saw the Guidry automobile and that the actual point of impact was in about the center of the intersection.
The district judge made no express finding as to this particular fact. He simply concluded that Savoie "did what he could to avoid the accident after ascertaining that the Guidry automobile was not going to abide by the traffic laws regulating the traffic on Mustang Street." This conclusion is supportable by the record. Savoie's testimony, as briefly outlined above, could reasonably be construed to mean that he first saw the Guidry vehicle as it passed the yield sign and entered the intersection. He was not required to ascertain any sooner that Mrs. Guidry was going to violate the yield sign. Our jurisprudence *878 is established that the motorist on a right of way street, with knowledge of the location of a stop or yield sign, has a right to assume that any driver approaching the intersection from the less favored street will observe the law and can indulge in this assumption until he sees, or should see, that the other car has not observed, or is not going to observe, the law. Koob v. Co-operative Cab Co., 213 La. 903, 35 So.2d 849 (1948); Bourgeois v. Francois, 245 La. 875, 161 So.2d 750 (1964); Fontenot v. Liberty Mutual Insurance Co., 130 So.2d 462 (3rd Cir.1961).
The final issue is the quantum of damages allowed 3 of the children. Loretta Guidry, 14 years of age, received a bruise to her scalp, a slight sprain of the tissue in the cervical area and a badly sprained right ankle. The cervical injury cleared up in a few days but the sprained ankle produced swelling, inflammation and pain for about 3 months; and intermittent tenderness and pain on activity for about a year, requiring corrective shoes and curtailing to some extent her activities. The trial judge's award of $1,250 to Loretta is clearly within the range of his great discretion as to the quantum of damages.
Yvette Guidry, 7 years of age, sustained a broken clavicle and a bruise of the skull. Yvette wore a figure-8 bandage on her shoulder for approximately 8 weeks and was required to remain inactive for about 16 weeks. The trial judge's award of $2,500 to Yvette is also within the range of his great discretion.
Shelia Guidry, 3 years of age, was seen in the emergency room of the hospital after the accident. The doctors found no physical signs of injury but said that she had sustained a bruise of the skull and a contusion of the ribs. The lower court's award of $200 to Shelia is not excessive.
The fourth child, John Guidry, suffered no injuries as a result of the accident and no award was made on his behalf.
For the reasons assigned, the judgment appealed is affirmed. All costs of this appeal are assessed against the defendant appellant.
Affirmed.

On Application for Rehearing.
En Banc. Rehearing denied.