444 So.2d 1286 (1984)
Elaine Roussel, wife of/and Gaskin James ROUSSEL
v.
Eartha J. BERRYHILL, et al.
SOUTHERN FARM BUREAU CASUALTY INSURANCE COMPANY
v.
Eartha J. BERRYHILL.
Nos. 83-CA-533, 83-CA-534.
Court of Appeal of Louisiana, Fifth Circuit.
January 10, 1984.
Rehearing Denied February 17, 1984.
Writ Denied April 2, 1984.
*1288 Thomas J. Kliebert, Jr. and Michael K. Heltz, Gramercy, for plaintiffs-appellees.
Bernard, Cassia, Babst & Saporito, Joseph S. Palermo, Jr., Metairie, for defendants-appellees.
Jesse S. Guillot, New Orleans, for defendant-appellant.
Before BOUTALL, GRISBAUM and DUFRESNE, JJ.
GRISBAUM, Judge.
This consolidated action involves a twocar collision with resulting injuries. Defendant, Eartha Berryhill, while driving along Louisiana Highway 44, crossed the center line of the road and collided with plaintiff's, Roussel's, vehicle. Ms. Roussel and her husband, Gaskin James Roussel, filed suit individually and on behalf of their minor children for the injuries sustained. Made defendants are Ms. Berryhill; Dairyland Insurance Company, insurer of the Berryhill car; the State of Louisiana through the Louisiana Department of Transportation and Development (DOTD); and Southern Farm Bureau Casualty Insurance Company, the Roussel's motor vehicle insurer. The DOTD answered, denying liability and alleging negligence on the part of Ms. Roussel and Ms. Berryhill. Southern Farm, in a separate lawsuit, filed an action against Ms. Berryhill and Dairyland to recover by way of conventional subrogation monies paid to the Roussels under the terms of the medical payment and uninsured motorist coverage clauses of the Southern Farm insurance policy. This suit was consolidated with the Roussel's main demand. The trial was held in October and November of 1982.
The trial court awarded damages to Elaine Roussel, Dru Ann Roussel, and Sherie Roussel for personal injuries sustained in the accident. It further awarded medical expenses paid for treatment of injuries of all family members to Gaskin and Elaine Roussel and $1,000,000 to Shaun Roussel, the six-month old son of Mr. and Ms. Roussel, for all injuries, mental, physical, and economic, sustained by him. The trial court found the DOTD failed to properly maintain the highway in a safe condition and also found defendant Eartha Berryhill's negligent driving to be a concurrent cause of the injuries. The trial court held the DOTD liable for the full amount of damages awarded and Berryhill liable with the DOTD in solido for $10,000 of the damages, the limit of Berryhill's insurance policy. From this judgment, the DOTD suspensively appeals, alleging it was not negligent in the maintenance of Louisiana Highway 44, and that, even if the highway was poorly maintained, Berryhill's negligence was the proximate cause of the accident. Further, the DOTD claims damages awarded to Shaun Roussel are excessive. Shaun's parents, on his behalf, answer the appeal requesting the trial court's award be increased to $2,000,000. We affirm.
Two issues are presented:
(1) Whether the DOTD is strictly liable under article 2317 of the Louisiana Civil Code for the accident and the resulting *1289 injuries to the Roussels, and whether the DOTD was negligent under article 2315 of the Louisiana Civil Code in its failure to maintain the safety of its highway.
(2) Whether the record clearly reveals the trial court abused its discretion in awarding $1,000,000 in damages to Shaun Roussel.
FACTS
On the afternoon of July 24, 1978, Elaine Roussel was driving her truck in a northerly direction along Louisiana Highway 44, and the defendant, Eartha Berryhill, was driving her car in a southerly direction along the highway. As both vehicles were entering what is commonly called the "Welham Curve", the Berryhill car skidded across the center line of the highway, entered the northbound lane of traffic, and collided with the Roussel vehicle.
As a result of the accident, the occupants of the Roussel truck, Elaine and her children, Dru Ann, Sherie, and Shaun, sustained serious personal injuries. Immediately following the accident, Shaun was rushed to St. James Parish Hospital in Lutcher, Louisiana for emergency treatment. Dr. Carl Poche, a family practitioner, was called to the emergency room. He testified at trial Shaun was crying and screaming which, he said, indicated the child was in pain. Upon examination Dr. Poche discovered a "large mushy probable hematoma of the entire right side of the head." His interpretation was there were multiple fractures radiating in different directions and a depressed fragment of skull bone in the right temporal and right parietal areas of the skull, which indicated a severe injury to the head. He referred Shaun to Ochsner Foundation Hospital, and upon arrival there, Shaun was examined by Dr. Richard A. Coulon, Jr., a specialist in the field of pediatric neurosurgery. Dr. Coulon's examination revealed a cephalhematoma, a swelling over the right side of the head under the scalp. Dr. Coulon noticed a decreased movement in the upper and lower extremities and a weakness in the left upper extremity consistent with brain damage. He stated at trial Shaun had abnormal eye findings, which were consistent with damage to the right side of the head. X-rays taken of Shaun's skull showed a quite significant right skull fracture which ran from the front all the way to the back on the left side of the head. According to Dr. Coulon the child developed an epileptic seizure within 24 hours of the examination and was started on the drug, phenobarbital. At one point the doctor was concerned with the possibility of a blood clot in the infant's head, and he decided to perform exploratory surgery on August 4, 1978 at Ochsner Foundation Hospital at the fracture site to see if part of the brain was working its way through the fractured bone. The surgery revealed the brain was extruding throughout the entire length of the fracture so that the bones were forcefully separated, the covering of the brain torn. It was necessary for Dr. Coulon to remove devitalized tissue from the fracture site. According to Dr. Coulon's orders, Shaun is to be kept indefinitely on phenobarbital to prevent subsequent epileptic seizures.
In addressing the initial issue, it is necessary to determine whether article 2317 of the Louisiana Civil Code is applicable. Louisiana jurisprudence permits recovery on the basis of strict liability under article 2317 of the Louisiana Civil Code when (1) the thing which caused the damage was in the care or custody of the defendant, (2) the thing had a vice or defect, that is, some condition which occasioned an unreasonable risk of injury, and (3) the injury was caused by the defect. Jones v. City of Baton Rouge, 388 So.2d 737, 739 (La.1980); Alleman v. State of Louisiana Department of Highways, 416 So.2d 272, 276 (3d Cir.1982); and Everett v. Louisiana Department of Transportation and Development, 424 So.2d 336, 339 (1st Cir.1982).
CUSTODY
The DOTD admits Louisiana Highway 44 is in the care and custody of the State by virtue of L.S.A.-R.S. 48:191.
*1290 DEFECT
The plaintiffs introduced several letters and presented testimony to substantiate their allegation that Welham Curve was so hazardous as to warrant state action. On October 3, 1977, Mr. J.C. McGrew, District Engineer of the Louisiana Department of Highways, wrote to Mr. George A. Fischer, Secretary DOTD, stating:
Realignment of Welham Plantation
State Route La. 44 has a very severe reverse curve at this location which should be realigned. The Jury and/or Levee Board has removed a portion of the levee embankment to provide better sight distance, but now finding approaching the curve is being hit more often and the accident occurrence has apparently increased. Realignment is severely needed and Mr. W.T. Taylor has since advised me he will have the curve geometry studied for possible realignment. (Emphasis added)
On August 4, 1978, Representative Joseph Accardo, Jr. wrote to St. James Parish Sheriff Gordon Martin stating he had conferred with Mr. W.T. Taylor, Assistant Secretary of DOTD, concerning the dangerous condition of the road at Welham Curve. Further, on August 14, 1978 Mr. Taylor advised Mr. Paul Keller, St. James Parish Policy Jury President, that Welham Curve was being prepared for a redesign "in an effort to reduce the hazards at this curve." Representative Accardo testified he had personally discussed with Mr. Taylor the hazardous conditions of Welham Curve.
Nathan Ficklin, an accident reconstruction expert, whose testimony was unrebutted, stated the road's substandard adhesive qualities and defective horizontal alignment caused the accident. Ficklin conducted a slope meter test at Welham Curve and concluded it was safe to traverse at 25 miles per hour when the road is dry. No tests were run at Welham Curve when it was wet. Kenneth Mason, a DOTD traffic and planning specialist, also ran a slope meter test at Welham Curve when it was dry, his results concurring with those of Ficklin. Although no tests were conducted at Welham Curve when it was wet, a general consensus existed between these experts that a road's surface, when wet, will have less adhesive qualities than when dry.
Louisiana State Trooper Victor F. Summers, III, the investigating officer, testified the posted speed limit at Welham Curve is 45 miles per hour and that there are no warning signs near the curve to warn of the road's surface being slippery when wet.
Deputy Sheriff John M. Falgoust stated that when the road is wet, cars "lose the curve," causing them to fishtail and cross over the center of the road. Further, he testified that one cannot even stand in the curve when it is wet without slipping and falling. In addition, Deputy Sheriff Kenneth M. Oubre testified that whenever it rained, "lots of fishtailing" occurred in the curve resulting in accidents. Oubre, who investigated the accident, along with Deputy Summers, testified he personally experienced slipping and skidding in the Welham Curve and stated he knew of no other curve which is as dangerous. Finally, St. James Parish Chief Deputy Sheriff Steven Reed testified that Welham Curve was "bad" and that far too many accidents occurred there.
The defendant, Berryhill, testified that once in the curve, she saw the oncoming vehicle and started to apply her brakes, trying to avoid colliding with the Roussel vehicle. She testified she was driving a new car and did not experience any vehicular malfunction at the time of the accident.
The trial court stated in its reasons for judgment that the testimony of these witnesses regarding objectively verifiable evidence of the road's defect was "completely credible." Based upon the overwhelming and unrebutted testimony presented by the plaintiff, we find, as the trial court did, the road's substandard adhesive qualities and defective horizontal alignment presented an unreasonable risk of injury.
CAUSE
The defective condition of Louisiana Highway 44 is easily associated with the harm incurred by the plaintiff and is a cause in fact of the harm. The DOTD *1291 alleges Berryhill's negligence is the sole proximate cause of the accident, but this court finds the defective road was a substantial factor in causing the accident, and thus the defective road and Berryhill's negligence are concurrent causes.
While the DOTD is not a guarantor of the safety of all traveling motorists, courts have consistently found the state owes a duty to keep highways and shoulders reasonably safe for non-negligent motorists. Sinitiere v. Lavergne, 391 So.2d 821, 824-825 (La.1980). The record clearly reveals Elaine Roussel was not negligent. Eartha Berryhill was held negligent by the trial court because, while she was driving below the posted speed limit, she was driving too fast given the weather and road conditions in this particular situation thereby violating Louisiana Revised Statute 32:64 A[1]. Furthermore, it is proven in the record that Berryhill was familiar with Welham Curve, and thus was aware of the need to drive more slowly. Even so, fault on the part of the DOTD was substantial and Berryhill's negligence was not so significant as to absolve the DOTD from liability. Everett, 424 So.2d 336, 342. The DOTD's duty to maintain the safety of its highways is imposed to protect against risks such as the one presented by this particular set of facts. The DOTD owed this duty to the plaintiffs, breached it, and is liable to them pursuant to article 2317 of the Louisiana Civil Code.
In addition, in view of the DOTD's duty to see that highways are reasonably safe for persons exercising ordinary care and reasonable prudence and in view of the evidence that the Department was informed of the danger and had ample opportunity to cure the highway's defects, there is a prima facie case of negligence under article 2315 of the Louisiana Civil Code against the Department. Everett, 424 So.2d 336, 341.
In addressing the second issue of whether the record clearly reveals the trial court abused its discretion in awarding $1,000,000 to Shaun Roussel, the record shows, after the required reconstruction skull surgery which was performed by Dr. Coulon in August of 1978, Shaun suffered permanent damage to his brain. He was examined by Dr. Coulon at Ochsner periodically during the several years following the surgery. On October 18, 1978, Dr. Coulon noted the child was beginning to develop symptoms of spasticity and his movements were becoming more rigid. On September 27, 1979, Dr. Coulon further noted Shaun had persistent spastic change on the left side of his body and his Achilles tendon was tight and was causing an abnormal gait. Shaun was beginning to toe walk and throw his hip out, and he had relatively little use of his upper left extremity. He was seen again by Dr. Coulon in January of 1980, at which time the doctor noted there had been absolutely no change in Shaun's left-sided symptoms. In June of 1980, Dr. Coulon observed that Shaun's Achilles tendon was still tight, but there was some relaxing in the upper extremity, and the flex posture was loosening. In addition, there was evidence Shaun was experiencing speech delay. Dr. Coulon's prognosis is as follows:
I think Shaun is going to be a permanent... is going to have permanent deficit as a result of his injury. And I think the most obvious deficit is the spastic weakness of his left arm and left leg. I think also he has got an excellent chance of being epileptic.
Dr. Coulon testified Shaun would be limited by his lack of coordination and inability to function with the left side of his body. He stated, "(Shaun) is going to have the same limitations most likely that some stroke victims have."
*1292 As for earning capacity, the doctor stated he believed Shaun would not be able to engage in most occupations, especially manual labor occupations. The child, according to Dr. Coulon, will be unable to engage in any activity requiring good legs and reflexes or good coordination in both hands. Dr. Coulon stated Shaun has the capacity in his left arm for gross movement only and is unable, for example, to button a coat or open a safety pin.
Three other witnesses testified with regard to Shaun's condition. Gail Wiltz, an evaluation coordinator, determined Shaun's mental age to be 2 years, although he was chronologically 2.8 years old at the time of the evaluation. Wiltz also determined Shaun to have a low intelligence range which is 1 year and 8 months below his chronological age. She stated the child needs a speech program because of his speech impairment which, she added, may be due to anxiety.
Jane Roussel, an employee of the St. John Baptist Parish School System, qualified as an expert registered occupational therapist. She testified she believed Shaun would be capable of performing only sedentary work during his lifetime; due to his perceptual deficits he will be at risk of failing to master reading and writing skills and will be placed in different learning situations than a normal child; and his ability to function in an educational setting will be limited. Roussel based these conclusions upon a finding of perceptual and upper extremity problems.
Plaintiff's witness, Ronald Schroeder, who qualified as an expert in economics, calculated loss of future wages, and his testimony on this matter was unrefuted. He subtracted the projected minimum wage from the projected average production wage for the 52 years in which Shaun can be expected to be employed. Shaun's employment years were predicted to begin at 18 years of age, the age at which high school graduates who do not attend college typically begin to work, to the age of 70, the mandatory retirement age. Upon arriving at a figure for lost wages, Schroeder utilized a 5 percent discount rate, as well as an 8 percent and 12 percent discount rate to reach a final amount for loss of earnings. By Schroeder's calculations, a 5 percent discount rate would yield a loss of future earnings in the amount of $1,801,682; an 8 percent rate would yield $813,846; and a 12 percent rate would yield $332,036. Schroeder stated at trial a 5 percent discount rate is "ultra conservative," and the trial court stated in its reasons for judgment that it accepted 6 percent as the appropriate discount rate.
We find the trial court's reliance on Schroeder's calculations for loss of future earnings was not an abuse of discretion. No alternative means for calculating loss of future earnings was presented by the evidence, and the plaintiff's expert made reasonable calculations despite the complexity of determining the child's projected wages. Moreover, Louisiana jurisprudence has found the utilization of a 6 percent discount rate to be acceptable. See, Falcon v. Bigelow-Liptack Corp., 356 So.2d 507, 513 (1st Cir.1977).
From the medical and supporting expert testimony, this court finds the plaintiff has succeeded in proving (1) he has a physical disability caused by the accident and (2) he will be unable to perform skilled labor due to this disability. Moreover, the evidence presented at trial supports the trial court's assumption that Shaun will be restricted to a minimum wage job as a result of his injury. The preponderance of the evidence shows Shaun suffers from an academic handicap which may well be attributable to his injury. Thus, Shaun is unable to succeed in college. While, arguably, the plaintiff did not succeed in proving by a preponderance of the evidence that Shaun's academic disability was caused by the accident, the DOTD must take its victim as it finds him. Perniciaro v. Brinch, 384 So.2d 392 (La.1980).
This court finds the child should not be deprived of an award of lost future earnings, extended over a lifetime, simply because he was unemployed at the time of the injury and cannot prove "actual loss." Our Louisiana Supreme Court in Folse v. *1293 Fakouri, 371 So.2d 1120, 1123 (La.1979) recognized that damages for loss of future earnings or loss of future earning capacity should be based upon the injured person's ability to earn rather than upon what he actually earned prior to the injury. The Folse court stated damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily. Folse, supra.
There is nothing in the record to enable the reviewing court to determine the exact amount of the $1,000,000 award which covers loss of future earnings at a 6 percent discount rate. The trial judge stated he accepted 6 percent as the appropriate discount rate in this case but failed to give the discounted figure, which is impossible to determine based upon what appears in the record. This figure, when subtracted from the $1,000,000 award, leaves the amount awarded for pain and suffering. Consequently, it is difficult for this court to review the award for pain and suffering. Regardless, the trial court's determination of damages will not be disturbed unless the record clearly reveals an abuse of discretion. Perniciaro v. Brinch, 384 So.2d 392 (La.1980). Since the $1,000,000 awarded is substantial enough to cover an amount of damages for loss of future earnings which is supported by Schroeder's testimony, along with a reasonable amount for pain and suffering, this court finds there is no abuse of discretion. Schroeder's testimony supports an award for lost future earnings in an amount ranging from $332,036 to $1,801,682. If, for example, the trial court intended to award Shaun $950,000 lost future earnings, the amount for pain and suffering is then $50,000, and in awarding this amount the trial court would not have abused its wide discretion.
For the reasons assigned, the judgment of the trial court is affirmed. All costs of this appeal are to be assessed against the appellant.
AFFIRMED.
NOTES
[1] LSA-R.S. 32:64 A

A. No person shall drive a vehicle on the highway within this state at a speed greater than is reasonable and prudent under the conditions and potential hazards then existing, having due regard for the traffic on, and the surface and width of, the highway, and the condition of the weather, and in no event at a speed in excess of the maximum speeds established by this Chapter or regulation of the department made pursuant thereto.