347 So.2d 889 (1977)
Will B. BEVIL and Bill H. Bevil, Plaintiffs-Appellants,
v.
HEATH TIMBER COMPANY, INC., Terry Leger and Insurance Company of North America, et al., Defendants-Appellees.
No. 6025.
Court of Appeal of Louisiana, Third Circuit.
June 30, 1977.
*890 Joseph W. Greenwald, Lake Charles, for plaintiffs-appellants.
Jones, Patin, Harper, Tete & Wetherill by Kenneth R. Spears, Scofield, Bergstedt & Gerard by Robert L. Hackett, Lake Charles, Bishop & Rutledge by Tommy C. Rutledge, DeQuincy, Plauche, Smith, Hebert & Nieset, Reid K. Hebert, Woodley Fenet & Ranier, Drew A. Ranier, Lake Charles, for defendants-appellees.
Before DOMENGEAUX, GUIDRY and ROGERS, JJ.
ROGERS, Judge.
This personal injury action was instituted by Will B. Bevil on behalf of his minor son, Bill H. Bevil, against defendants Bennie J. Heath, d/b/a Heath Timber Company, Inc., Insurance Company of North America, Terry M. Leger, and Heath Timber Company, Inc., and in the alternative against the defendant, Lumberman's Mutual and Casualty Company, a subsidiary of Kemper Insurance Company. Various third party demands followed involving defendants Louisiana State Department of Highways, Ford Motor Company, the City of DeQuincy, Louisiana, and Travelers Indemnity Company. After trial by jury, a verdict was returned in favor of plaintiff, Will B. Bevil, and against defendants, Terry M. Leger, Heath Timber Company, Inc., and Insurance Company of North America, for the sum of ten thousand and no/100 ($10,000.00) dollars for medical expenses and property damage, and further granting plaintiff Bill H. Bevil the sum of ten thousand and no/100 ($10,000.00) dollars against defendants Terry M. Leger, Heath Timber Company, Inc., and Insurance Company of North America, for general damages. (During the course of the litigation, Bill H. Bevil became a major.)
The plaintiffs have filed a devolutive appeal alleging as their sole specification of error that the jury abused its discretion by inadequately awarding Bill Bevil the sum of ten thousand and no/100 ($10,000.00) dollars for general damages, and further urging that the evidence supported a minimum award of two hundred thousand and no/100 ($200,000.00) dollars.
The facts relative to the accident are undisputed. On July 30, 1974, at approximately twelve o'clock noon, Bill H. Bevil was operating his 1974 Honda 350 motorcycle at a moderate speed, traveling in a southerly direction on Page Street, a major thoroughfare which traverses the city of DeQuincy, Louisiana. When he approached the intersection of LeBlanc Street, a vehicle which was owned by Heath Timber Company, Inc., and driven by its employee, Terry M. Leger, failed to stop at the stop sign controlling traffic on LeBlanc Street, thereby causing defendant's vehicle to strike plaintiff. At the time of the accident, the defendant's vehicle was traveling in a westerly direction on LeBlanc Street and Leger, the driver, was acting in the course and scope of his employment with Heath Timber Company, Inc.
After the accident, Bill Bevil was taken by ambulance to the emergency room of the West Calcasieu-Cameron Hospital, where he was placed under the care of Dr. Jerome W. Ambrister, an orthopedic surgeon. A long history of medical treatment ensued, which history will be described in greater detail below.
*891 The trial was commenced on September 23, 1976, and it resulted in a jury verdict that found defendant Terry M. Leger to be negligent, plaintiff Bill H. Bevil to be free from negligence, and awarded general damages to Bill H. Bevil in the sum of ten thousand and no/100 ($10,000.00) dollars, and awarded Will B. Bevil for medical expenses and property damage the sum of ten thousand and no/100 ($10,000.00) dollars. After plaintiff's motion for additur and motion for a new trial were both denied, judgment was signed on October 21, 1976 in favor of plaintiffs and against defendants Terry M. Leger, Heath Timber Company, Inc. and Insurance Company of North America, in accordance with the jury verdict. Plaintiffs thereupon perfected a devolutive appeal to this court.
As mentioned above, the sole issue raised on this appeal is that of quantum.
Plaintiff presented two major arguments on appeal. After reviewing Bill Bevil's injuries, resulting disabilities, and medical history, plaintiff contended that the evidence supported a much greater award than $10,000.00 for general damages. Next, plaintiff cited several personal injury cases involving allegedly similar injuries in an attempt to show that the award in the instant suit was greatly out of proportion, and thus was an abuse of the factfinder's discretion.
Defendants responded to plaintiff's medical history contending that Bill Bevil had recovered successfully from his injuries and had suffered little residual disability. Defendants further urged that their inability to pay a large sum of money was a factor that influenced the jury's assessment of damages. And as to the argument that the instant award was out of proportion to prior reported awards, defendants briefed several personal injury cases which they alleged involved similar injuries and which resulted in general damage awards less than that granted in the case at bar.
We find that the quantum issue in the instant suit is controlled by Louisiana Civil Code Article 1934(3) and the recent Louisiana Supreme Court case of Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977). In the landmark Coco decision, the Supreme Court, Justice Calogero writing, fully explored the "much discretion" principle of appellate review found in Article 1934(3) and traced the development of this principle through the various landmark Supreme Court cases that have interpreted it.
The section of Article 1934 which states the principle is quoted in pertinent part as follows:
"In the assessment of damages under this rule, as well as in cases of offenses, quasi offenses and quasi contracts, much discretion must be left to the judge or jury . . ." (italics added)
While the Coco decision reaffirmed the constitutional authority of the Courts of Appeal to review quantum awards of the trial courts (p. 335 of the decision), the Supreme Court limited the exercise of that power in the following manner:
"We do reemphasize, however, that before a Court of Appeal can disturb an award made by a trial court that the record must clearly reveal that the trier of fact abused its discretion in making its award. (Citations omitted) Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court. (Citations omitted) It is never appropriate for a Court of Appeal, having found that the trial court has abused its discretion, simply to decide what it considers an appropriate award on the basis of the evidence."
And in the paragraph following the above, the Supreme Court met the question of how much importance should be given prior reported decisions involving similar injuries:
"Further we believe that, heretofore, courts of appeal have placed too much emphasis on their review of other reported decisions. Certainly no two cases are ever fully alike. And whether two cases *892 are so similar as to produce like quantum judgments is hardly discernible by gleaning the facts of the comparable decision from simply a written opinion of an appellate tribunal."
In the recent case of Schexnayder et ux. v. Carpenter et al., La., 346 So.2d 196 handed down May 16, 1977, 338 So.2d 344 (La.App.1977), in a further elaboration of Coco, supra, our Supreme Court stated that since the jury does have, under the law, much discretion in fixing damages, the appropriate procedure for testing whether the jury abused its discretion is to determine whether the award can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the jury.
In light of the foregoing instructions from the highest court of this state, and considering that both plaintiff and defendants are able to cite some similar cases where quantum awards were both greater and lesser than that before, we feel compelled to attach little significance to those cases, and instead, we base our decision herein solely on the evidence found in the record.
A careful review of the record uncovered the following evidence which we consider relevant in making a determination of whether the jury abused its discretion.
Three orthopedic surgeons testified at the trial in regard to Bill Bevil's injuries. Two of them, Dr. Jerome W. Ambrister and Dr. David Drez, Jr., treated the young man, and the third, Dr. Norman T. Morin, examined him on only one occasion. Dr. Ambrister was the first to treat Bill Bevil, initially seeing him in the emergency room of the West Calcasieu-Cameron Hospital about noon, July 30, 1974, the day of the motorcycle accident. Dr. Ambrister's initial examination revealed that the patient had suffered three fractures, two in the left leg and one in the right leg. In the left leg, there was protrusion of bone through the skin which x-rays revealed to be the fractured tibia. The fibula of the left leg was also fractured, as was the distal right tibia.
Dr. Ambrister observed and recorded gross deformity of the left lower extremity, deformity and swelling about the distal right leg, and pain and deformity of the right leg near the ankle. It was necessary to debride, that is, remove all non-living tissue from the compound wounds of the left tibia, and perform a relaxing incision to reduce the undue tension of the skin brought about by the swelling. The fracture was then reduced and immobilized by means of traction. A long leg cast was applied to the right extremity after it had been reduced by closed reduction manipulations. Dr. Ambrister continued treating the patient until August 3, 1974, when he was transferred to the care of Dr. Drez at St. Patrick's Hospital.
When Dr. Drez first examined the patient on the evening of August 3, 1974, both lower extremities of the patient were encased in plastic casts. Dr. Drez continued observing the patient on a regular basis and during an examination on August 17, 1974, observed that the wound on the left leg was not properly healing. The bone which had previously been covered by some granulated tissue was open to the air. Dr. Drez was afraid to do any skin grafting at that time because the wound was still "angry looking".
Eventually, on September 5, 1974, Dr. Drez was forced to do an involved skin grafting operation known as a rotational flap in an attempt to get some form of skin coverage over the open wound. Further skin grafting procedures were performed on September 7, 1974 and September 24, 1974. On September 28, 1974, the wound had improved to the point where Dr. Drez was able to discharge the patient, to be followed by regular office visits at intervals of approximately a week to ten days.
Around October of 1974, Dr. Drez felt that the skin coverage over the wound had improved to the point where he was able to do something more to get the bone to heal. At that time, he placed the patient in a patilla tendon bearing cast, which is a short leg cast that is placed on persons with a *893 fractured tibia to help stimulate bone healing. The short cast enables the patient to begin placing weight on the fractured bone which stimulates circulation and thus helps the bone to heal.
On January 2, 1975, Dr. Drez had the cast removed and the left leg x-rayed, which revealed no evidence that the bone was starting to heal. Then, in February of 1975, when the bone still showed no signs of healing, Dr. Drez discussed with Bill Bevil and his father the necessity of performing a bone graft and placing a metal plate over the fractured area. This procedure was performed on June 3, 1975, and the leg was placed in a cast following the operation. Finally, on July 22, 1975, Dr. Drez felt that the fracture had healed sufficiently to allow removal of the cast and placement of the patient in a leg brace.
The patient had been in plaster casts for so long that he had developed a tight heel cord. He was also developing pain in his ankle due to the tightness of the cast and the immobilization of the extremity for so long. The patient was advised by Dr. Drez to walk as much as possible to stretch out the heel cord and to get the joints moving. On September 25, 1975, the patient was fitted with a 3/8 inch heel lift in an attempt to alleviate developing back pain that resulted from the shortness of his left extremity.
X-rays taken in December of 1975 revealed to Dr. Drez that the fracture was satisfactorily healed. At that time, the leg brace was removed and the patient was encouraged to walk and use his extremity, but was directed not to run or put significant stress on the left leg. The patient was again examined by Dr. Drex in May of 1976 where it was observed that the left leg was four centimeters or almost two inches shorter than his right leg. At that time, Dr. Drez discussed with the patient the possibility of again operating on the leg in about a year to remove the metal plate, due to the risk of bone cancer caused by the carcinogenic tendencies resulting from metal next to bone.
At the trial in September of 1976, Dr. Drez's general assessment of the youth's condition was that he was recovering exceptionally well relative to the seriousness of his injuries, injuries which Dr. Drez classified as "very painful". In his opinion, the youth had suffered a twenty-five to thirty-five percent permanent disability to his left leg, and a two or three percent permanent disability to his right leg. It was Dr. Drez's opinion that these disabilities would impair Bevil's employment opportunities for any job requiring normal physical agility. As mentioned above, Dr. Drez felt that it might be necessary for the patient to undergo surgery in the future to remove the metal plate from his left leg. He also felt that Bevil faced the future possibility of developing arthritis in his left leg.
Dr. Morin examined the youth on February 28, 1975, and his assessment of the patient's injuries generally coincided with that of Dr. Drez's. He testified at the trial, however, that he was unable to make a determination of the boy's permanent disabilities because at the time he examined him, the treatment and recovery period was not final.
Dr. Ambrister again examined the patient, subsequent to his earlier primary care administered immediately after the accident, on March 9, 1976. This later examination confirmed the shortness of the left leg, marked scarring, wasting of muscle about the fracture site, a limp favoring the left leg, and limited dorsal flexion of the left ankle joint. Dr. Ambrister opined that Bill Bevil suffered a permanent twenty-five percent disability of his left foot, and a permanent shortening of his left leg.
The record reveals that prior to the accident of July 30, 1974, Bill Bevil led the life of a typical teenager for the community in which he lived. That summer, Bevil was between the tenth and eleventh grades at DeQuincy High School, and was an average student with about a "C" grade point average. Subsequent to the accident, Bevil's life-style was drastically changed as could be expected for someone who had to undergo the extensive medical treatment he experienced as outlined above. The youth *894 was able to finish high school with his class, but only through the aid of home tutoring and other special accommodations.
On the basis of the above evidence, we feel that the jury abused its much discretion by awarding only $10,000.00 to Bill Bevil for general damages.
Counsel for defendants strongly and ably urged that the jury properly considered the ability to respond in damages of Terry Leger, a young man of modest means with a wife and one child, and Heath Timber Company, a small family concern with little assets, in refusing to grant an excessively large award. Barrett v. State Farm Mutual Automobile Insurance Company, 236 So.2d 900 (La.App. 3rd Cir. 1970); Adams v. Ross, 300 So.2d 192 (La.App. 1st Cir. 1974); Rollins v. New York Fire and Marine Underwriters, Inc., 225 So.2d 663 (La.App. 3rd Cir. 1969).
It is our belief, however, even after giving due consideration to defendants' ability or inability to pay, that it was within the jury's much discretion, based on the evidence found in the record, to grant an award ranging from $20,000.00 at the lowest point to $50,000.00 at the highest point for general damages.
Therefore, for the reasons assigned, the judgment appealed from is amended by increasing the award made to plaintiff, Bill H. Bevil, for general damages, from $10,000.00 to the sum of $20,000.00. In all other respects the judgment of the trial court is affirmed. The costs of this appeal are assessed to defendants-appellees.
AMENDED AND AFFIRMED.