444 So.2d 1252 (1983)
Randall Albert LeRAY
v.
ST. PAUL FIRE AND MARINE INSURANCE COMPANY, et al.
No. 82-CA-0843.
Court of Appeal of Louisiana, First Circuit.
November 22, 1983.
Opinion Concurring in Part, Dissenting in Part November 30, 1983.
Concurring Opinion December 1, 1983.
Rehearing Denied February 14, 1984.
Writ Granted April 13, 1984.
*1253 Paul H. Due and Charles F. Duchein, III, Baton Rouge, for plaintiff-appellee.
Donald T.W. Phelps, Baton Rouge, and Lloyd W. Hayes, New Orleans, for defendants-appellees *1254 St. Paul Fire and Marine Ins. Co., Dr. B. Eugene Berry, Drs. Acree, Davis and Berry (A Professional Medical Corp.).
Roger M. Fritchie, H. Evans Scobee, Baton Rouge, Robert E. Leake, Jr., New Orleans, for defendant-appellant American Hosp. Supply Corp. (Edwards Laboratories Div.).
Before EDWARDS, WATKINS and SHORTESS, JJ.
EDWARDS, Judge.
Plaintiff obtained a $3,640,000.00 damage judgment against defendant American Hospital Supply Corporation, Edwards Laboratories Division. Edwards Labs appeals. We affirm.

BACKGROUND FACTS
On August 20, 1976, plaintiff was admitted to the Baton Rouge General Hospital, suffering from multiple pulmonary emboli. This is a condition when blood clots (emboli) migrate from the lower extremities and lodge in the lungs, causing decreased respiration, lung damage, and in some instances, death.
On the following day, Dr. B. Eugene Berry, a thoracic and cardiovascular surgeon, was consulted by the admitting physician. Dr. Berry recommended the insertion of a 28 mm Mobin-Uddin umbrella filter in plaintiff's inferior vena cava. This filtering device, manufactured by Edwards Labs, would block the migration of blood clots to plaintiff's lungs.
The 28 mm filter was implanted without complication on August 21, 1976. However, several days later, it was discovered that the filter had unseated from the vena cava and migrated to the right lung, lodging in plaintiff's right pulmonary artery. Dr. Berry allowed plaintiff's condition to stabilize for a few hours and then proceeded to surgically remove the filter. However, during this operation, plaintiff suffered an extended period of hypotension or low blood pressure, causing oxygen deprivation of the brain. As a result, plaintiff incurred permanent brain damage.
Suit was subsequently brought against Dr. Berry and his insurer, St. Paul, and Edwards Labs Division of American Hospital Supply Corporation. Plaintiff alleged negligence on the part of Dr. Berry and defective design (strict liability) by Edwards Labs. A few days before trial, plaintiff settled with Dr. Berry and St. Paul for $750,000.00. After trial, the jury returned a verdict holding Edwards Labs liable to plaintiff and finding no negligence by Dr. Berry.
In this appeal, Edwards Labs, defendant, alleges numerous errors, which we will now consider.

MOTION FOR DIRECTED VERDICT
As plaintiff's suit against defendant was grounded in strict design products liability, his burden was to establish a defect in defendant's filter which caused his injuries. Defendant, however, alleges that plaintiff failed to meet this burden and, therefore, its motion for a directed verdict should have been granted. The trial judge denied the motion, stating that he felt "that there is sufficient evidence upon which reasonable minds could differ and that being the test, [the] motion is overruled." Our review of the record demonstrates that the judge's ruling was correct.

JURY INSTRUCTIONS
At the close of the trial, the jury was instructed by the judge on the standard of liability to be applied to defendant. As for the instruction regarding the definition of a "defect", the judge stated to the jury that:
"A product is defective or unreasonably dangerous when a reasonable seller would not sell the product if he knew the risk involved or if the risks are greater than a reasonable buyer would expect." (Trial p. 1367)
The jury was then instructed to assess defendant's liability under this standard. Defendant contends that this definition is improper and resulted in an erroneous verdict.
*1255 Defendant submits that the determination of a design defect involves the consideration of the product's benefits, risks, and purpose. Hunt v. City Stores, 387 So.2d 585 (La.1980). Defendant asserts that such a "balancing test" instruction to the jury would have resulted in a verdict of dismissal.
However, our examination of the jurisprudence indicates that the judge's definition of "defect" is accurate. The Supreme Court in DeBattista v. Argonaut-Southwest Ins. Co., 403 So.2d 26 (La.1981) and Hebert v. Brazzel, 403 So.2d 1242 (La. 1981), defines a defective or unreasonably dangerous product as one that is dangerous to an extent beyond that which would be contemplated by an ordinary consumer. This shift to a consumer expectation approach for determining defectiveness impliedly rejects the prior balancing test of Hunt, supra, and supports the instruction given the jury.

VERDICT UNSUPPORTED BY EVIDENCE
David Chonette, president of Edwards Labs, testified that they were aware of the migration problems of the 28 mm filter by 1974. Attempts were then made to incorporate hooks on the filter to improve seating and eliminate migration, but these were abandoned. Chonette further stated that the hooks would probably not prevent migration anyway, as he felt the filter's inability to expand past 28 mm was the true cause of the migration problem.
The hook idea came from a competitor's filtering device, known as the Kimray-Greenfield (KG) filter, which has small recurved hooks for engaging the walls of the vena cava. Additionally, the design of the KG filter permits it to expand with the vena cava up to approximately 40 mm. Unlike defendant's filter, the KG filter had no reported instances of migrating to the upper body.
Although fully aware of the risks (i.e., lung damage, impaired respiration, death) that migration posed, defendant continued to market and sell its filter. These risks, of which plaintiff was not informed, are certainly greater than a reasonable consumer would expect, especially in the present situation where defendant should have made further attempts to improve or redesign its product in light of its known deficiencies and the existing technology.
The record contains sufficient evidence to furnish a reasonable basis for the determination that defendant's filter was defective, and therefore, the jury verdict of liability is not manifestly erroneous. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978).

NEGLIGENCE OF DR. BERRY
Defendant asserts that the jury erred in finding Dr. Berry not negligent in his treatment of plaintiff. Specifically, defendant points to testimony alleging that Dr. Berry implanted the filter at an improper angle; that heparin therapy or ligation of the vena cava was preferable to filter implantation; that plaintiff's consent to the filter insertion was made without adequate disclosure of the risks involved; and that the subsequent operation to remove the filter was negligently performed by Dr. Berry.
However, the record also contains equally strong testimony refuting all of the above alleged facts. Rather than delineate the testimony of the six expert witnesses (five medical doctors and one biomedical engineer), it suffices to say that there is sufficient evidence in the record to supply a reasonable factual basis for the jury verdict absolving Dr. Berry of negligence. Arceneaux, supra.

SETTLEMENT WITH DR. BERRY AND ST. PAUL
As a part of the settlement agreement between plaintiff and Dr. Berry, St. Paul retained a contingent interest in the litigation. A pretrial stipulation between counsel established that only the fact of settlement would be revealed to the jury. However, at trial, defendant attempted to introduce evidence to the jury regarding St. Paul and Dr. Berry's interest in the suit because of the settlement.
*1256 However, we feel that the defendant is bound by the pretrial stipulation which it freely entered into. This agreement allowed only the fact of settlement to be revealed to the jury. The trial judge's denial of defendant's efforts to inform the jury of St. Paul and Dr. Berry's interest in the suit was proper.
Defendant further asserts that since St. Paul was assigned an interest in plaintiff's suit, it should have been made a party plaintiff under La.C.C.P. art. 698. Defendant argues the present judgment allows plaintiff to recover St. Paul's $750,000.00 settlement without them being named as a co-plaintiff. Defendant therefore urges that the judgment be reduced by this amount.
However, by the terms of the agreement, plaintiff retained full discretion to settle with defendant or proceed to trial. Therefore, it was obvious that no true "assignment" was intended between the parties, since St. Paul could not independently litigate its interest. The trial judge was correct in overruling defendant's objection, as there was no necessity for joining St. Paul as a co-plaintiff.

ADMISSION OF MEDICAL ARTICLES
During the trial, plaintiff referred to several articles in examining the expert witnesses. Some of these articles were written by Dr. Kazi Mobin-Uddin, the inventor of defendant's filter. The other articles were authored by medical doctors who reported the results of research in the area of vena cava filtering devices.
Defendant objected to the use of these articles by plaintiff as hearsay evidence. However, the trial judge ruled that the articles written by Dr. Mobin-Uddin were admissible under the declaration against interest exception to the hearsay rule. These articles showed that Dr. Mobin-Uddin and defendant were aware that the hooks on the KG filter prevented migration, and that similar hooks would or could be placed upon defendant's filter. The judge ruled that Dr. Mobin-Uddin, as the inventor and continuing paid consultant to Edwards Labs, stood in the shoes of defendant and that his statements would be considered admissions or declarations against interest on the part of defendant. We agree with the trial court's ruling. The mutual interest of Dr. Mobin-Uddin and defendant safeguards the reliability of this evidence. Campbell v. American Home Assurance Company, 260 La. 1047, 258 So.2d 81 (1972).
Defendant further argues that even if the articles by Dr. Mobin-Uddin are exempt from the hearsay rule, they should still be excluded because there was no showing that the conclusions therein were reached prior to plaintiff's injuries in 1976. As mentioned above, these articles showed that the defendant was aware of the migration-preventing hook configuration of the KG filter and that similar hooks would or could be placed on defendant's filter.
However, the testimony of David Chonette indicates that as early as 1974 or 1975 the defendant was considering the addition of hooks to its own filters in light of the superior migration record of the KG filter. Thus, defendant's argument is without merit.
As for the use of the other medical articles, portions of these were read to various expert witnesses, who then agreed with or interpreted the offered section. These portions dealt with the absence of migration found in the KG filter, the benefits and disadvantages of the hooks on the KG filter, and its ability to expand.
The trial judge ruled that these portions were admissible under the learned treatise exception to the hearsay rule. We agree. The articles were all written by competent physicians who are experts in the field. The limited use of these articles to illustrate alternative filter designs was proper. Moreover, the points covered by these articles were corroborated by the testimony of David Chonette, president of Edwards Labs.

EVIDENCE OF DEFENDANT'S SALES
During the cross-examination of David Chonette, plaintiff inquired as to defendant's *1257 annual sales level. Defendant promptly objected that defendant's sales level was irrelevant. In response, plaintiff rephrased his line of questioning to determine whether defendant had any spending limits on a product's research and development. After several evasive answers, the trial judge suggested that plaintiff directly ask Chonette how big the company was. Plaintiff proceeded to do so, without objection by defendant, and learned that defendant's 1981 sales were approximately 2.9 billion dollars.
Defendant argues that this sales evidence was improperly admitted over its objection. However, defendant cannot now complain that the evidence was improperly admitted, as no objection was made to plaintiff's second question concerning defendant's sales. Defendant's sole objection did not continue to plaintiff's subsequent questions.

PLAINTIFF'S JURY ARGUMENT
During plaintiff's closing argument to the jury, counsel made references to the medical articles and sales evidence discussed above. Defendant contends that these remarks are prejudicial and inflammatory, resulting in an erroneous award.
However, as these items of evidence were properly admitted into the record, it follows that references thereto by plaintiff cannot be prejudicial. Moreover, defendant failed to timely object during plaintiff's argument, and therefore cannot be heard to complain now on appeal. Temple v. Liberty Mutual Ins. Co., 330 So.2d 891 (La.1976).

EXAMINATION OF EVIDENCE BY JURY
After some deliberation, the jury returned and requested to see all the exhibits introduced into the record. The judge informed the jury that they could not examine written or documentary evidence, and then determined which exhibits were permissible for examination.
The items submitted to the jury were excerpts from plaintiff's high school year book, high school and college transcripts, diagrams of the KG and defendant's filter, pre-injury photograph of plaintiff, photographs of plaintiff's paintings, a poster advertising a benefit show for plaintiff, and a chart depicting plaintiff's past and future wage loss. Defendant objects that these exhibits should not have been examined by the jury.
All of these items, with the possible exception of the wage loss chart, are representative of an "object or document received in evidence which requires a physical examination to enable them to arrive at a just conclusion," (La.C.C.P. art. 1974), and were properly sent to the jury by the trial judge.
As for the wage loss chart, defendant particularly objects that it was error for the jury to have this during the deliberations. This type of chart could unduly influence a jury. However, the chart in question was nothing more than a recapitulation of the testimony of Dr. Randolph Rice, plaintiff's economic expert, concerning the plaintiff's wage loss. In this situation, we find no error by the trial judge in submitting the chart to the jury.

EXCESSIVE DAMAGES
The jury awarded plaintiff the following damages:

 (A) Damages for personal injuries,
 including permanent disability,
 past and future pain
 and suffering, past and future
 mental anguish and distress
 and future attendant care - $2,500,000.00
 (B) Loss of income, past and
 future - 1,040,000.00
 (C) Medical expenses, past and
 future - 100,000.00
 _____________
 $3,640,000.00
 _____________

Defendant contends that all three award categories are excessive, and urges their reduction.
In awarding damages for areas such as personal injuries, pain and suffering and mental anguish, a jury is granted great discretion. In such cases, our review is limited to determining whether the jury has abused this discretion, given the circumstances of the case. Reck v. Stevens, 373 So.2d 498 (La.1979). As recently stated *1258 by this court in Cage v. Shainberg's Stores of La., 413 So.2d 564, 566 (La.App. 1st Cir.1982):
"A jury is granted great discretion in fixing an award for general damages which cannot be fixed with any degree of certainty, such as pain and suffering. In such cases, our review must be limited to a determination of whether the jury has abused its discretion, based on the circumstances of the case. Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1977); Rheams v. McCray, 346 So.2d 834 (La.App. 1st Cir.1977); Averett v. Alexander, 336 So.2d 227 (La.App. 1st Cir. 1976). And, since the jury does have much discretion in fixing damages, the appropriate procedure for testing whether the jury abused its discretion is to determine whether the award can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the jury. Schexnayder et ux. v. Carpenter et al., 346 So.2d 196 (La.1977); Bevil v. Heath Timber Company, Inc., 347 So.2d 889 (La.App. 3rd Cir.1977).
The record demonstrates that plaintiff was indeed severely injured. Following surgery to remove the filter, plaintiff was in a deep coma for about ten days, and semi-comotose for two months thereafter. Upon regaining consciousness, plaintiff could only speak single words but not complete sentences. Plaintiff's condition was similar to that of a newborn baby in that he had to be completely re-educated in how to talk. It was subsequently determined that he had suffered moderate brain damage.
In November, 1976, plaintiff was sent to the Texas Institute of Rehabilitation and Research in Houston, Texas, for therapy and treatment. When plaintiff returned in 1977, he could converse but his speech was still slurred. His movements were uncoordinated and spastic, and he lacked fine motor skills. His wife Linda, desiring a new life, remained in Houston and subsequently obtained a divorce and remarried. Since then, plaintiff has had no social life regarding women.
Although plaintiff has improved since returning from Houston, his movements are still slow, uncoordinated and spastic. He must depend on others to a great extent for day-to-day activities and will never be an independent individual. Presently, plaintiff spends his days at the YMCA for physical therapy and the Adult Continuing Education Center for learning rehabilitation. His father, who is retired, chauffeurs plaintiff around because driving by him is inadvisable due to his spasticity and a tendency to get lost. Moreover, it is doubtful plaintiff could ever obtain a valid driver's license. His mother cooks his meals and cleans his clothes. In short, plaintiff relies on his parents for most daily activities.
However, both parents are elderly and in ill health, his father suffering from terminal cancer and his mother from heart disease and high blood pressure. Plaintiff, 33 years old, will certainly be in need of future attendant care during the estimated 40 remaining years of his life. He is presently unable to care for himself to even a minimum degree, and it is uncertain whether he could be trained to do so. The cost of such future attendant care over 40 years has been estimated by plaintiff's economic expert, Dr. Randolph Rice, to be approximately $800,000.00 (present value) for 16 hours of care daily, using a minimum wage pay scale.
Psychologically, plaintiff has been characterized as having a slow thinking process. Unfortunately, he is aware of his mental and physical handicaps, and this has generated frustration, depression, anger and anxiety within plaintiff. The gains he has made since 1976 have encouraged him to hope unrealistically for almost total recovery. Plaintiff has avoided dealing with the grief over the loss of his former self. Dr. Darlene Nemeth, neuropsychologist, stated that further long-term supportive psychotherapy would be necessary to counsel plaintiff on the reality of his condition.
Based on the above evidence, the jury awarded plaintiff $2,500,000.00 damages for personal injuries, permanent disability, past/future pain and suffering, *1259 past/future mental anguish and distress and, additionally, future attendant care.
Although unitemized, a reasonable figure that is supported by the record for the award of future attendant care would be approximately $800,000.00, as discussed above. The remaining $1,700,000.00 would represent the award for general damages. Our examination of the record, as illustrated above, convinces us of the devastating loss incurred by plaintiff from his tragic injury. We feel the award for general damages, as well as the award for attendant care, to be amply justified and supported by the record. No abuse of the jury's great discretion has been shown.
As for the award for lost wages, it is clear from the record that the jury's award of $1,040,000.00 is supportable. Curtis Charrier, occupational consultant, testified that plaintiff could not engage in any gainful employment. Dr. Randolph Rice, plaintiff's economic expert, submitted a figure of $1,039,408.00 to compensate plaintiff for past/future lost wages, based on plaintiff's probable earnings over his thirty years of work-life expectancy had he not been injured. We find no abuse of discretion in the jury's award.
Turning now to the award of $100,000.00 for past and future medical expenses, we find that the record shows approximately $20,000.00 was incurred in past medical expenses. The remaining $80,000.00 of the award is justified in light of the future rehabilitation and psychotherapy efforts facing plaintiff. We likewise find no abuse of discretion in this award.

DECREE
Accordingly, for the above-expressed reasons, we affirm the decision of the trial court at appellant's cost.
AFFIRMED.
WATKINS, J., concurs and assigns reasons.
SHORTESS, J., concurs in part and dissents in part and assigns reasons.
WATKINS, Judge (concurring).
The learned treatise exception to the hearsay rule as it applies to direct examination permits learned treatises to be quoted in corroboration of an expert opinion as such treatises are prepared for scholars in the field, and properly form the partial bases for the formulation of the opinion of another expert in the field, the expert witness.
The defendant strenuously contends that Louisiana follows the general rule that medical books or treatises are inadmissible on direct examination as hearsay. But the implication in the majority opinion, in which I concur, that learned treatises may be read aloud on direct examination by an expert witness in court under the learned treatise exception to the hearsay rule, does find support in Louisiana jurisprudence.
In State v. Nicolosi, 228 La. 65, 81 So.2d 771 (1955), the Louisiana Supreme Court found the trial court acted correctly in a criminal narcotics case in permitting the State's expert witness to read from a pamphlet published by the U.S. Treasury Department Bureau of Narcotics, as the pamphlet furnished in part the basis of the witness' expert opinion, and was a scientific treatise.
It is true that in Jennings v. Allstate Insurance Company, 273 So.2d 534 (La. App. 1st Cir.1973), we affirmed the action of the trial court in refusing to permit a doctor to refer to and explain the effect of electric shock of the mother upon an unborn fetus. However, our action in affirming the trial court was not intended to constitute a repudiation of the learned treatise exception to the hearsay rule, but rather, as we stated, was prompted by the fact the doctor called to testify had no personal experience with the subject. The learned treatise was thus in effect sought to be introduced for its internal value alone, without the benefit of the opinion of the expert witness called to testify, who had no knowledge of the subject.
Thus, where a learned treatise forms a partial basis of the opinion testimony of an expert witness, it may be quoted by that *1260 witness to support his view. However, where the expert witness is incapable of forming an opinion because of his lack of experience or knowledge of the subject matter, the learned treatise may not be quoted by that witness, as in such a case the learned treatise is pure hearsay, and could be quoted as easily by one not called as an expert.
Guidry v. Grain Dealers Mutual Insurance Co., 193 So.2d 873 (La.App.3d Cir. 1967), a case dealing with the inadmissibility of automobile braking distance charts did seem to indicate that learned treatises are inadmissible as hearsay. However, that case conflicts directly with Nicolosi, supra, a Supreme Court decision, and is not binding upon this circuit.
The learned treatise exception, therefore, is recognized in Louisiana, and does permit on direct examination learned treatises to be referred to in support of an expert opinion.
I respectfully concur.
SHORTESS, Judge concurring in part, dissenting in part.
I concur in the result on the liability issue.
I dissent in part from the majority's treatment of general damages. I find the jury's award of $2,500,000.00 shocking. I sympathize with plaintiff because he did, indeed, sustain grievous and disabling injuries. In Naylor v. La. Dept. of Public Highways, et al., 423 So.2d 674 (La.App. 1st Cir.1982), writs denied, 429 So.2d 127, 134 (La.1983), however, the plaintiff suffered even more devastating injuries, and his award for general damages was upheld by this court which stated that "we are unable to say that the trial judge abused his much discretion in awarding plaintiff one million dollars in general damages." 423 So.2d at 685.
I would give plaintiff the $800,000.00 for future attendant care but would reduce the award of general damages to $1,800,000.00.
Accordingly, I respectfully concur in part and dissent in part.