467 So.2d 574 (1985)
Barbara CAPONE
v.
Roger KING, et al.
No. 84-CA-361.
Court of Appeal of Louisiana, Fifth Circuit.
March 11, 1985.
Writs Denied May 24, 1985.
*576 Theodore A. Mars, Jr., Steven O. Medo, Jr., New Orleans, for plaintiff-appellee Barbara Capone.
Charles W. Schmidt, III, New Orleans, for defendant-appellant Chicago Ins. Co.
Don Massey, Mark C. Suprenant, New Orleans, for defendant-appellee Pennsylvania General Ins. Co.
Timothy G. Schafer, New Orleans, for defendant-appellant Aetna Ins. Co.
Robert E. Kerrigan, Jr., Philip D. Lorio, III, New Orleans, for defendant-appellee Continental Cas. Co.
Daniel A. Ranson, Gretna, for defendant-appellee Aetna Cas. and Sizeler Realty Co.
Robert M. Johnston, New Orleans, for defendant-appellee Dresser Magcobar.
Robert L. King, in pro. per.
M.G. Cordes, Lawrence E. Abbott, Steven M. Lozes, Felicien P. Lozes, New Orleans, for defendant-appellee Hartford Acc. & Indem. Co.
Before BOUTALL, GAUDIN and DUFRESNE, JJ.
DUFRESNE, Judge.
This is a suit for damages for personal injuries suffered by Barbara Capone, plaintiff, in a two car collision. The trial court awarded her damages of over 4.7 million dollars. Aetna Insurance Company and Chicago Insurance Company were cast in judgment for this amount under uninsured motorist policies issued by them on the car in which Capone was a passenger. We find that Aetna and Chicago were properly cast in judgment. However, we further find *577 that the award was excessive and reduce it to $1,373,776.31.

FACTS
On the day of the accident, Barbara Capone was riding as a passenger in Mrs. Dean Coffer's Buick automobile. The two women were travelling north on the elevated portion of Interstate Highway 55, on the way to Hammond for a business meeting. According to the police report of the accident, the Coffer Buick was in the right lane of traffic. A few car lengths behind, but in the left lane, was an 18 wheel truck owned by Dresser-Magacobar and driven by Burnell Wallace. A second 18 wheel truck, driven by Richard Myers, was about 50 feet behind Burnell, probably also in the left lane. These three vehicles were all travelling between 55 and 60 miles per hour. Shortly before the accident occurred, Wallace and Myers received a call on their C.B. radios warning them that a speeding station wagon veering from lane to lane was somewhere on the highway. This call was made by Sidney Kinchen who had almost been struck by the station wagon when it passed his pick-up truck. Wallace and Myers soon saw the station wagon in their mirrors. They both reduced their speed, but remained in the left lane. The station wagon passed the trucks on the right, and then attempted to switch to the left lane to pass the Coffer car. Unfortunately, the right front bumper of the station wagon struck the left rear bumper of the Buick, knocking it into the right rail of the highway. The Buick then rolled over, throwing the two women onto the highway. Mrs. Coffer was killed, and Barbara Capone suffered extensive brain damage. The station wagon came to rest in the left emergency lane. The two Magcobar trucks were able to stop safely, one behind the other in the left lane, without striking either car.
It was later determined that Roger King was the driver of the station wagon. He was not seriously injured. King refused to take a breath test, but several witnesses stated that he smelled strongly of alcohol, and the investigating officer concluded from his observation of King that he was in a "high degree of intoxication". He further concluded from the skid marks and witnesses' statements that King was travelling between 100 and 110 miles per hour.
King had no liability insurance on his car. The Coffer car was insured by Allstate Insurance Company for $100,000 in U.M. coverage. Because Mrs. Coffer was using her automobile in the course and scope of her employment with Mall Advertising Incorporated, it was also insured under policies issued to Mall by Aetna Insurance Company for liability in the amount of $500,000, as well as an additional 5 million dollars under an umbrella liability policy provided by Chicago Insurance Company. It is also possible that Capone was insured by Hartford Accident and Indemnity Company under a policy issued by it to U.T. Corporation for whom she apparently worked. Finally, Capone was an insured under her mother's U.M. policy with Pennsylvania General Insurance Company.
After trial on the merits, the trial judge made the following pertinent findings:
1. The sole cause of the accident was the negligence of Roger King. The drivers of the two Magcobar trucks did not negligently contribute to the incident in any way.
2. The Aetna and Chicago liability policies contained no waiver or selection of lower limits of U.M. coverages as they pertained to Mrs. Coffer's car, and therefore provided such coverage up to the liability limits of the policies.
3. Because the Allstate, Aetna, and Chicago policies provided primary U.M. coverage to Capone, and were sufficient to cover all damages, it was not necessary to reach the potential coverage provided by Hartford and Pennsylvania General.
4. The Aetna and Chicago policy limits were available to the plaintiff, even though she had previously settled her claim against Allstate, Coffer's insurer, for $95,000.
*578 5. Ms. Capone's damages were determined to be $4,785,755.51.
This appeal followed.

1. SOLE CAUSE OF THE ACCIDENT
The first issue raised here is whether the two Magcobar truck drivers were contributorily negligent. We agree with the trial court's finding that they were not, and that King's negligence was the sole cause of the accident. The parties seeking to show some negligence on the part of these drivers rely on the unsubstantiated theory that these truckers were attempting to block the highway and prevent King's passage. The evidence giving rise to this theory was that when Kinchen radioed the warning about King, he also urged that someone should try to stop or block him before someone was killed. Although Wallace and Myers both acknowledged that they received this message, both denied that they had attempted to block King. We find no error in the trial court accepting this testimony.
The proponents of this theory further argue, however, that the actions of Myers in allegedly switching into the right lane before King reached him shows that he did attempt a blocking maneuver. We reject this assertion for several reasons. First, Myers made several contradictory statements in depositions and at trial about whether he was in the left or right lane at the time of the accident. However, taken as a whole, the evidence shows that more probably than not, Myers was in the left lane. Wallace consistently testified that when he got Kinchen's radio call, he began looking for the station wagon in his rear view mirrors. He further noted that because Myers was directly behind him, his view was blocked. The first glimpse that he got of King was in his left mirror when the station wagon veered into the left emergency lane, thus coming into a field of vision not blocked by Myers' truck. The next sighting he had of King was when the station wagon passed him on the right. The testimony of both Myers and Wallace was that when they saw the accident they made emergency stops. Both expressed fears that their trucks would jack knife because they were pulling loads of 50,000 pounds each. The photographs of the scene show Wallace's truck stopped in the left lane about a car length behind the station wagon, and Myers' truck about ten feet directly behind it, parallel with and between the lane markers. In this court's opinion, it is highly unlikely that Myers could have gotten his loaded truck into that position during an emergency stop had he been in the right lane.
We also point out that we would not find negligence on Myers' part even had he been in the right lane. Dr. Robert Erlich, an accident reconstruction expert, was presented with a scenario in which Myers was in the right lane. His opinion was that if King passed Myers on the left, Wallace's truck would have hidden the Buick until he switched back into the right lane to pass Wallace. Given the estimated speed of all the vehicles, it would then have been impossible for King to avoid hitting the Buick. Erlich referred to this situation as a "trap" and stated that the position of the trucks therefore contributed to the accident. While we appreciate this reasoning, it simply does not establish any fault on the part of the truckers. One could also argue that the position of the Buick was also a part of this "trap" and therefore contributed to the accident. But such causes in fact of an incident do not give rise to liability unless they were brought about by some negligent conduct.
It is finally argued that the truckers violated La.R.S. 32:71(B)(1), which requires slow moving vehicles to travel in the right lane and not impede overtaking vehicles from passing on the left. We do not find this statute applicable here for two reasons. First, as was stated in Fernandez v. Aetna Casualty & Surety Co., 180 So.2d 828 (La.App. 4th Cir.1965), the statute does not apply to vehicles travelling at the normal speed limit. Second, and more important, the situation created by King was such that compliance with the statute may well have heightened the danger to the motorists. Indeed Erlich stated directly *579 that the most prudent action to take when confronted by a speeding car erratically changing lanes is to slow down and not change your position on the road because such a change might well confuse the speeder. This is precisely what Wallace did, and what Myers more probably than not, did.
Under these circumstances, we find no error in the trial court's exoneration of the truckers from fault.

2. U.M. COVERAGE OF AETNA AND CHICAGO POLICIES
The next issue concerns the coverage provided by the Aetna policy. Mr. Joseph O'Connor, testifying for Aetna, stated that Aetna's policy provided liability coverage of $500,000 on the Coffer car. He further stated that had Capone been injured through Mrs. Coffer's negligence, she would have been covered up to the limits of the policy. The question before us is therefore whether this policy also provided U.M. coverage on the Coffer car, and if so, in what amount.
Louisiana's U.M. statute, La.R.S. 22:1406, provides that any policy of automobile liability insurance shall also provide U.M. coverage in the same amount as liability coverage, unless U.M. coverage is waived or lower limits of such coverage are selected in writing. In the policy at issue here, two classes of automobiles are insured: owned and non-owned. Further, the only selection of U.M. coverage was for 5/10 thousand dollars on owned vehicles. There is no waiver or selection as to non-owned vehicles covered for liability.
Aetna argues that because Mall selected the 5/10 coverage for owned cars, it implicitly rejected all U.M. coverage for non-owned cars. We disagree. The U.M. statute in effect writes into every automobile liability policy U.M. coverage equal to the limits of liability. Any reduction or waiver of this coverage must be made in writing. The only writing in the policy relating to U.M. coverage is a selection of 5/10 limits on cars owned by the insured. There is no writing reducing or waiving coverage to the liability limits on non-owned insured cars, and therefore the U.M. statute imposes on the policy U.M. coverage of $500,000.
Aetna also argues that the policy cannot provide U.M. coverage, because it only protects the corporate insured against liability, and does not protect persons per se. However, this assertion is belied by the fact that U.M. coverage of 5/10 thousand dollars is specifically selected as to owned automobiles. If the policy by its nature did not include U.M. coverage, then how could such coverage be selected at lower limits on owned vehicles, and whom would it protect, if not persons such as Capone who were injured by uninsured motorists. Obviously, then, the policy did provide U.M. coverage, and because there was no waiver or reduction as to non-owned cars, that coverage was $500,000.
In regard to Chicago's umbrella policy, we similarly agree that it was available to Capone to the liability limit of 5 million dollars. Chicago's basic argument is that umbrella policies do not provide U.M. coverage, and therefore no waiver or selection of lower limits need be made. However, it has now been determined that umbrella policies which provide automobile liability coverage are governed by La.R.S. 22:1406, Southern American Insurance Co. v. Dobson, 441 So.2d 1185 (La.1983). Chicago admits that no waiver or selection of lower limits was made, and therefore by operation of statute their policy provides U.M. coverage to Capone to the 5 million dollar limits of liability.
Alternatively, Chicago asserts that even if its policy provides U.M. coverage, it is not liable here because La.R.S. 22:1406 allows "stacking" of only one insurance coverage beyond the primary coverage. It argues that because the Coffer's Allstate policy is primary, Capone can reach only one other policy, i.e. that of Aetna. Again, we disagree.
The statute states that primary coverage is coverage on the "vehicle in which the injured party was an occupant", La.R.S. 22:1406(D)(1)(c)(i). Section 1406(D)(1)(C)(ii) states that once primary coverage is exhausted, *580 the injured party may then reach one other non-primary policy. Because the Allstate, Aetna and Chicago policies all covered the car in which Capone was a passenger, they are all primary, and therefore available without reference to the above rule on stacking.

3. SUFFICIENCY OF AETNA & CHICAGO POLICIES
In this same regard, Aetna and Chicago attempt to reach the Hartford policy for contribution. However, we agree with the trial court that any coverage provided by Hartford would have been secondary under La.R.S. 22:1406(D)(1)(C)(ii). Aetna and Chicago's policies were primary because they insured Mr. Coffer's automobile via her employment by Mall Advertising. Hartford's policy did not insure Mall, but rather the U.T. Corporation, for whom Capone worked. Because the Hartford policy did not therefore insure the Coffer car, any coverage it provided would not have come into play unless Capone's damages had exceeded the primary coverages. Because the primary coverages were sufficient, there was no need to reach the Hartford policy. The same is true for the Pennsylvania General policy issued to Capone's mother.

4. EFFECT OF SETTLEMENT WITH ALLSTATE
The fourth issue raised by Aetna and Chicago is what effect the settlement made by Capone with Allstate has on the judgment against them. Capone released Allstate, in return for $95,000 of their $100,000 coverage, and reserved her rights against all other parties. Aetna and Chicago cite Hoefly v. Government Employees Insurance Co., 418 So.2d 575 (La.1982), for the rule that all U.M. insurers are liable in solido. They further argue that because the release of one solidary obligor with reservation of rights against the others renders the others liable for only a virile share of the debt, they should only be cast for one half of the judgment. This argument ignores the purpose of the U.M. Insurance statute which is to make whole the innocent victim of the negligence of an uninsured or underinsured motorist. In practice, it would mean that whenever an underinsured's insurer settled with the victim, the victim's U.M. insurer would automatically become liable for only one half of the victim's damages not compensated up to the limits of its policy. This is not in accord with La.R.S. 22:1406, cf. also Taylor v. Tanner, 442 So.2d 435 (La.1983).
However, we do agree with Aetna's and Chicago's assertion that a set-off of $100,000 should be made. The Allstate policy provided this limit, and had Capone chosen to litigate with the company she would have recovered the full amount. That she chose to settle for $95,000, cannot operate to the prejudice of the other insurers in the amount of $5,000. Further, because the trial court found that she had suffered a fixed amount of damages, and because she has already recovered a part of those damages, she cannot be compensated twice for that portion of those damages. We further note that because the Chicago policy does not become operable until Aetna has paid its policy limit of $500,000, the $100,000 set-off is owing to Chicago.

5. QUANTUM
The final issue for resolution here is the amount of damages fixed by the trial court. In order for an appellate court to change an award for damages fixed by the trier of fact, it must first make an articulated analysis of the particular facts before it. Only if this analysis discloses an abuse of discretion may the award be considered insufficient or excessive. Once such a determination of abuse of discretion has been made, the court may then resort to prior awards in comparable cases for guidance in fixing the appropriate award in the case before it, Reck v. Stevens, 373 So.2d 498 (La.1979).
Turning to the facts before us, it is clear to this court that this award is an abuse of the trier of facts' much discretion in that the award is excessive. The trial court awarded the following itemized damages:

*581
 SPECIAL DAMAGES
1. Past Medical & Hospital Expenses $ 38,391.59
2. Past Dependency Care 39,556.80
3. Future Medical Expenses 200,000.00
4. Future Dependency Care 496,979.20
5. Past Loss of Income 42,464.64
6. Future Loss of Income 428,363.28
 GENERAL DAMAGES
7. Past Mental & Physical Pain and
 Suffering 480,000.00
8. Future Mental Pain and Suffering 3,060,000.00
 _____________
 Total Award: $4,785,755.51

Items 1, 2 and 5 are not contested.
Before turning to the other items, we must first review the effects Capone's injury have had on her life.
At the time of the accident, Barbara Capone was in her early twenties. She had recently graduated from L.S.U. in Baton Rouge in advertising with a B + average. She was described by other members of her family as an intelligent, amiable, modest girl who was ambitious and hard working. A few weeks before the accident she had been employed in an advertising-marketing position.
As to severity of the injury she suffered, we need only say that Dr. Bert Bratton, the neurosurgeon who treated her, stated that in ten years of practice he had never known of any patient to survive such an injury. After surgery to remove damaged brain tissue, Capone experienced several weeks of "animalistic type response", during which she exhibited bizarre, hostile, anti-social behavior, due to fluid pressure on the brain. To resolve this problem, a shunt or tube was inserted from the brain into the abdominal cavity to drain off excess fluids. This tube is still implanted in her body.
Because of the nature of her injury, she suffered impairment of certain mental functions. Specifically, her short term memory, and ability to name objects and speak in coherent sentences, were impaired. Additionally, there was a loss of social and sexual inhibitions which affected her ability to relate meaningfully to other people. Her motor functions were not impaired, however.
After prolonged speech therapy Capone was able to reacquire her ability to speak almost normally. On the other hand, she still suffers from short term memory problems, has difficulty comprehending what she reads, and cannot write coherently. She also has continuing problems relating to other people. All medical experts stated that these conditions are permanent.
We now turn to the specific items of damages contested here.
The award of $200,000 for future medical expenses is clearly not supported in the record. While we can appreciate the trial court's concern for Capone's possibly uninsurability for future medical problems, there was simply no evidence to establish such uninsurability. Further, Dr. Bratton was of the opinion that no future treatment for the injuries suffered would be needed. We therefore eliminate this item.
Likewise, the award of $496,979.20 for future dependent care is not clearly supported in the record. The trial judge based this figure on cost of care for eight hours per day, seven days a week for Capone's life expectancy, at minimum wages. It is urged here by appellants that the evidence failed to establish the need for such care. They note that Capone is able to dress herself, attend to her personal needs, drive an automobile, go to church and meetings with friends and go out on dates. She, however, has been interdicted and placed in her mother's care. The testimony of her mother also indicates that she cannot cook or keep house with any competency and has difficulty shopping for herself. Dr. Bratton suggested that she might do well living with a roommate of her own age; he did not recommend living alone. Thus, while it is clear that she does not need professional nursing care twenty-four hours a day or even for any period of time, it is equally clear that she does need some care and supervision for the rest of her life. Realizing that she will need this companionship or supervision, we cannot *582 eliminate entirely this item; however, we definitely find the award of $496,979.20 to be unrealistic. Accordingly, we find that an award of $125,000.00 will adequately provide the necessary funds for future dependency care, especially when considered with the total award.
We likewise affirm the award of $428,363.28 for loss of future earnings. Appellants argue that it was not shown that she cannot work. Again, the evidence is otherwise. This above average college graduate now has an intelligence level in the bottom 20% of the population. Her two attempts at working since the accident have been failures. Several of her supervisors on these jobs testified that she is unable to write coherently, cannot understand simple instructions or concepts, misspells simple words, omits phrases, sentences and entire paragraphs when typing, and on one occasion could not properly fold business letters and put them in envelopes. Capone testified that she spent fourteen hours writing a 15 second radio spot which her supervisor had to discard. On the basis of such testimony, we find no error in the trial court's conclusion that this woman is incapable of working. We further find no error in that court's acceptance of the economic expert's testimony as to what her future wages would have been.
We next turn to the more difficult question of the awards for past and future pain and suffering, which total $3,540,000.00. We find this figure excessive for the following reasons. Although Capone has suffered an injury which has irrevocably deprived her of a career for which she had diligently prepared, and rendered her incapable of many intellectual and emotional pleasures which would have been hers to enjoy, she is nonetheless not so affected as to render her life meaningless. She has no physical infirmities or disfigurement and retains her speech, hearing, and sight. Although she will never be completely independent, she is still capable of attending to her personal needs and going about without constant supervision. On these facts, we find this award far above an amount reasonable to compensate her for her loss.
Having determined that the award of $3,540,000.00 for general damages was an abuse of the trier of facts' discretion, we now turn to prior awards in comparable cases for guidance in fixing the appropriate award here. In Nichols v. Hodges, 385 So.2d 298 (La.App. 1st 1980), the plaintiff was permanently incapacitated for life, both mentally and physically and needed constant nursing care, therapy and medical treatment for the rest of her life. At the time of the accident she was 17 years old. The trial judge stated that "her chances of becoming self-sustaining are nil". She could not walk, crawl, turn over or stand without assistance. She had organic brain impairment, limited vocabulary and spoke with a defect. The judge found that she was "childlike" and had no chance of any improvement. The award for general damages was $750,000.00.
In Case v. Arrow Trucking Co., 372 So.2d 670 (La.App. 1st Cir.1979), the court awarded $800,000.00 to a 27 year old who, in addition to loss of part of frontal brain lobe, which affected his personality and intelligence, was believed to have suffered extensive damage to the remainder of his brain. He had difficulty in doing even simple yard work because of the inability to follow simple instructions. He underwent numerous surgical procedures and facial reconstruction and had numerous epileptic seizures, all necessitating close supervision and hospitalization.
In Carollo v. Wilson, 353 So.2d 249 (La. S.Ct.1977), the Supreme Court held that an award of $1,000,000.00 to a 7 year old who suffered a brain injury was excessive and reduced it to $600,000.00. The child suffered extensive brain damage, was in a coma for two months and the brain injury resulted in spastic paralysis causing permanent disability of 100% of the left upper extremity and 70% permanent disability to the lower left extremity and affected his intellectual ability and his personality.
In LeRay v. St. Paul Fire & Marine Ins. Co., 444 So.2d 1252 (La.App. 1st Cir.1984), *583 the court awarded $1,700,000.00 in general damages to a 33 year old who sustained brain damage. The facts showed that the plaintiff would be in need of future attendant care during his 40 year remaining life expectancy, and could not engage in any gainful employment. The plaintiff could converse but his speech was slurred and his body movements were uncoordinated and spastic. He lacked fine motor skills and had no social life. The court found that he must depend on others for day-to-day activities and would never be an independent individual. He was unable to care for himself to even a minimal degree and suffered from a "slow thinking process".
In Roussel v. Berryhill, 444 So.2d 1286, (La.App. 5th Cir.1984), the Court of Appeal confirmed an overall damage award of $1,000,000.00 to a six month old child who suffered permanent brain damage, had a persistent spastic problem with the left side of his body, speech delay, possibility of epilepsy, lack of coordination with no function on the left side of his body and a low intelligence range. The court awarded a total of $1,000,000.00 which included pain and suffering, future wage loss, specials, future dependency and other damages.
In Landry v. Bill Garrett Chevrolet, Inc., 443 So.2d 1139 (La.App. 4th 1984), plaintiff was awarded $500,000.00 in general damages for brain damage and multiple fractures of the ribs and skull. Plaintiff's brain damage resulted in an inability to think in abstract terms, plan events, handle finances or care for himself, and caused disability in walking, altered plaintiff's personality and caused him emotional imbalance resulting in uncontrolled periods of anger and rage towards others. Plaintiff had become a violent man, unable to control his personality and emotions and suffered severe damage to his higher cognitive brain functions and severe memory loss. The plaintiff would cry without provocation or explanation.
In Naylor v. Louisiana Department of Public Highways, 423 So.2d 674 (Ka.App. 1st 1982), the Court of Appeal upheld an award of $1,000,000.00 in general damages for a brain damage injury which rendered the plaintiff virtually helpless. The plaintiff sustained loss of motor coordination, experienced continued problems with breathing, was unable to control his bladder and bowels, was functionally blind in his right eye, unable to speak, lost part of his thinking process and experienced frequent and severe pain. The plaintiff was 55 years old and medical testimony was to the effect that he was not likely to improve from his present condition.
Of these cases, we find LeRay to be factually most similar to the case before us. While LeRay's condition is admittedly more severely limiting than that of Capone, there are nonetheless some similarities. We particularly note that like LeRay, Capone is aware of her mental handicap, and like him, experiences frustration, depression, and irritability when unable to do things which she could do before the injury. Capone has suffered a terrific trauma and extensive brain damage however, she is not totally incapacitated. We therefore find that a total award of $700,000.00 for past and future physical and mental pain and suffering is the highest award the trier of fact could reasonably have made on these facts in conjunction with the special damage award previously discussed.
Therefore, for the above and foregoing reasons, the judgment of the trial court is affirmed insofar as it cast Aetna Insurance Co. in judgment for $500,000.00 and Chicago Insurance Co. for the remainder of the award. The judgment is amended to allow a $100,000.00 set-off to Chicago which arises from Capone's settlement with Allstate. The judgment is further amended to reduce the total award for Capone to $1,373,776.31 with interest from date of judicial demand. All costs, both in this court and in the trial court are assessed to defendants, Aetna Insurance Co. and Chicago Insurance Co.
AMENDED AND AS AMENDED, AFFIRMED.